# SAMUEL H. BROWN AND CHARLES E. TRAIL, TRUSTEES, *vs.* THOMAS AND BENJAMIN F. DEFORD—THE FARMERS' & MECHANICS' NAT. BANK OF FREDERICK *vs.* THE SAME.

*Advance of Money Under Agreement that Property Purchased Therewith Shall Belong to the Lender—Construction of Contract—Assignment for the Benefit of Creditors—Rights of Subsisting Creditors—Interest.*

When A. advances money to B., who is indebted to him, under an agreement that B. shall use the same in the purchase of articles to be prepared for the market by B. and then sent to A. for sale on commission, the net proceeds to be placed to B.'s credit, and it is also agreed that the things so purchased shall be the property of A., such agreement entitles A. to claim the articles so purchased in B.'s possession as against pre-existing creditors of B. and his assignee for the benefit of creditors.

Certain tanners who shipped leather to D. & Co. to be sold on commission became indebted to the latter on drafts in advance of sales. An agreement in writing was then made between the parties which set forth that the money advanced by D. & Co. was for the purchase of hides and bark ; that the leather was to be sent to D. & Co. for sale, and after deducting charges the net amount was to be placed to the credit of the tanners to pay their indebtedness to D. & Co. It was also agreed that the leather, &c., "is the property of D. & Co., and they are authorized at any time to come forward and take possession of the same, and there are no other parties furnishing us money for the purpose of buying hides and bark." Subsequently the tanners made an assignment for the benefit of creditors, there being at that time upon their premises a large quantity of hides purchased with money advanced by D. & Co. These were sold by the assignees under an agreement that the rights of the parties should be transferred to the fund. The claim of D. & Co. to the same was contested by the trustees and by creditors of the tanners who were such at the time the agreement with D. & Co. was made. *Held,*

1st. That D. & Co.'s claim to the property could not be disputed by the trustees under the assignment, since they stand in the shoes of the assignors and take the property subject to all equities enforceable against them.

2nd. That the agreement between D. & Co. and the tanners was not void under the insolvent law as creating a lien for an antecedent debt, since this proceeding is not under that law.

3rd. That said agreement could not be sustained so as to entitle D. & Co. to claim the property, if in prejudice of the rights of subsequent creditors or purchasers in good faith.

4th. That the rights of D. & Co. to the property purchased with money advanced by them under the agreement was enforceable against pre-existing creditors of the tanners.

5th. That D. & Co. were entitled to interest on the fund arising from the sale of the property.

Appeals from the Circuit Court for Frederick County. The opinion of the Court below (McSHERRY, C. J., LYNCH and HENDERSON, JJ.), after setting forth the course of dealing between Deford & Co. and Brown & McKinney, and the contract between the firms, as stated in the opinion of this Court, proceeded as follows : " This paper (the said contract) was not executed on the day it bears date, but some few days afterwards Mr. McKinney went to Baltimore, and there, in behalf of the firm, signed it. After the execution of the paper, Brown & McKinney shipped their leather ex clusively to Deford & Co., and upon advices from the latter, drew, after such shipments, only the amounts which the consignees would by letter indicate their willingness to advance. Whilst at the outset of this new arrangement the value of the shipments exceeded by about twelve hundred dollars the amount of the advances, and resulted in a corresponding reduction of the old debt ; yet, in May, 1891, when the firm of Brown & McKinney failed, it owed Deford & Co. the sum of $14,197.58, or nearly $2,000 in excess of the amount due when the agreement was executed in July, 1888. As against this, Deford & Co. held in store in Baltimore 2,262 sides of leather shipped to them by Brown & McKinney at various times, and which, when sold, produced the net sum of $8,566.30. This being deducted from the amount due at the time of Brown & McKinney's failure, reduced the indebtedness to $5,631.28. On May the 19th, 1891, Brown & McKinney executed a deed of trust to Col. Chas. E. Trail

and Samuel Brown for the benefit of the creditors of the firm
and of its individual members.    There were then in process
of tanning on the yard of Brown & McKinney a consider-
able number of hides which were afterwards sold for about
$12,000.    These hides Deford & Co. claimed as their prop-
erty, and six days after the date of the deed of trust so noti-
fied the trustees in writing, and a few days later filed a peti-
tion in the trust proceedings, setting forth the grounds upon
which they based that claim.    Deford & Co. insist that they
furnished the funds with which these hides, when green,
were purchased by Brown & McKinney, and that under the
agreement dated July 24th, 1888, the hides continued to be
the property of Deford & Co., for whom they were tanned
by Brown & McKinney.    By arrangement the trustees com-
pleted the tanning of these hides and then sold them, and
now have the funds in Court to stand in the place of the
leather and to be dealt with as though there had been no
sale of the leather at all.    The trustees resist the claim of De-
ford & Co., and the Farmers' and Mechanics' National Bank
of Frederick, one of the creditors of Brown & McKinney,
contests its validity.    Both the trustees and the bank have
answered the petition filed by Deford & Co.    A consider-
able amount of evidence has been taken, and the single
question before us is whether Deford & Co. are entitled,
under the agreement of July, 1888, to the fund in Court, to
the extent of the balance due to them by Brown & Mc-
Kinney.

" The bank resists the claim of Deford & Co. on the
ground that the agreement of July, 1888, has relation only
to the hides and leather on the yard of Brown & McKinney
at the time the paper was executed, and that it has no ref-
erence to future transactions at all ; whilst the trustees under
the deed of trust contest the validity of Deford & Co.'s
claim on the ground that the agreement of July 24th is a
fraudulent and prohibited preference under the insolvent law,
and is therefore void as against the conventional trustees.
It is apparent, then, that the case turns upon the construc-

tion of the agreement of July, 1888, unless the provisions of the insolvent law intervene and strike it down as an unlawful preference."

After showing that the trustees under the assignment could not question the validity of the agreement as creating a void preference, the Court proceeded as follows :

"Now the manifest object which Deford & Co. had in procuring the agreement of July 24, 1888, was to reduce the antecedent indebtedness due to them by Brown & McKinney ; and the equally obvious motive of the latter in executing the paper was to effect that reduction without crippling their business. But in accomplishing these results none of the parties designed to create a new or additional debt, for ultimately such a proceeding would have been but a continuation of the old method of dealing, from which a departure was incontestably contemplated. To reduce the old indebtedness without putting the firm into liquidation, it was necessary that the tannery of Brown & McKinney should be kept a going concern.

"To avoid the creation of an additional indebtedness, if Brown & McKinney continued in business, it was necessary that the previous course of dealing should be materially changed, for from that course of dealing the then existing indebtedness had arisen. To effect both objects—the preservation of the business and the payment of the debt—it was necessary for Deford & Co. to have supervision over the debtor's business, and in a large measure to control and direct it after July 24th, 1888. In doing this Deford & Co. acted throughout in the best of good faith, and there is not the slightest reason to impute to them any sinister motive whatever. At the time the agreement of July was signed, the stock of hides in process of tanning and the unused bark upon the yard of Brown & McKinney were together estimated to be worth about $20,000.00, which was largely more than sufficient to pay the balance of $9,179.36 due to Deford & Co. after crediting the value of the sides they then had in store unsold. Had the parties contemplated

that the agreement of July 24th was a lien on, or a pledge of, only the stock then on the yard of Brown & McKinney and was not to be prospective in its operation and not to cover or apply to subsequent acquisitions of bark and hides, Deford & Co. would obviously not have continued to furnish money to the extent of $78,325.00 for the purchase after that date of other raw materials by Brown & McKinney; because such a course would have been merely a continuation of the method pursued prior to the execution of the agreement of July, and would have left the parties precisely where they were before they undertook to make a different arrangement. A construction of the paper which leads to this result cannot be the correct one, for it would give to the agreement no significance at all and would impute to the parties no motive for its execution. The agreement is inartificially drawn, but its object seems reasonably clear. It is expressed not in technical terms, but in the language ordinarily employed in mercantile transactions. It begins with the declaration " that all money advanced to Brown & McKinney by Deford & Co. is for the purpose of purchasing hides and bark," but does not state that all money *theretofore* advanced had been advanced for the purpose named. In commercial correspondence and memoranda, it is not at all infrequent that the infinitive mood of the auxiliary verb " to be " is dropped, causing an ellipsis, which is seldom misleading, because generally understood. The advances referred to are obviously advances to be made— advances of capital—for it does not appear that prior to the agreement of July any money was furnished by Deford & Co. except upon actual consignments of leather. Though the agreement speaks of the bark and hides as contained in the tannery and on the premises of Brown & McKinney, it clearly means such bark and hides as may be purchased and placed there, the reference to the tannery and premises being made to indicate not any particular lot of bark or hides contained in the tannery at any special point of time, but merely to describe the locality where all hides and

bark purchased after the date of the agreement with money to be advanced by Deford & Co. were to be manufactured into leather. The last sentence of the paper states that "there are no other parties furnishing us money for the purpose of buying hides or bark." And this was manifestly to preclude any claim by anyone else upon the raw materials or the finished stock. The import of the whole paper has relation to the future ; and if confirmation of this view were needed, the contemporaneous acts and conduct of all the parties, and their own construction of its meaning, as evidenced by those acts and that conduct, must set any controversy on this subject forever at rest. "That it was so understood is plain from the subsequent acts and conduct of the parties." *Mitchell et ux.* v. *Wedderburn et ux.*, 68 Md. 145. Deford & Co. suggested the prices which Brown & McKinney ought to pay for green hides and for bark, and regulated the amounts which Brown & McKinney might draw from time to time. Some of these drafts were drawn for the express purpose of purchasing hides, as is shown by a letter of Brown & McKinney, dated February 24, 1891 ; and some for the purchase of bark, as is shown by other parts of the record. Finally, when there seemed to be but little hope of extricating Brown & McKinney from their difficulties, Deford & Co., on March 19th, 1891, expressed a wish that someone else would furnish Brown & McKinney with the "capital to run" their business. This scheme coming to naught, the final collapse ensued on May the 19th, 1891, and then Brown & McKinney suspended, with upwards of twelve thousand dollars worth of stock on hand, all of which had been purchased with Deford & Company's money. This money had been furnished on the faith of the agreement of July, 1888. The fund now in Court, which arose from the sale of leather made from hides bought with the money of Deford & Co., the trustees claim should be distributed *pro rata* among all the creditors of Brown & McKinney, though the bank and most of the other creditors were subsisting creditors long before the agreement of July the 24th was

executed, and consequently never trusted Brown & Mc-
Kinney on the faith of the stock so purchaaed with
the money of Deford & Co.    In view of the con-
struction placed upon this agreement by the parties them-
selves, as evidenced by their course of dealing and their
their conduct, and in view of the fact that the chief creditors of
the extinct firm were such prior to the date of this agree-
ment, we do not feel warranted in placing upon that agree-
ment a construction, or in giving to it an interpretation,
which will take the funds realized from a sale of the prop-
erty bought with the money of Deford & Co., and will
apply those funds ratably amongst pre-existing creditors,
to the prejudice of Deford & Co.    The agreement of July
the 24th stands directly across the path of such a proceed-
ing.    " Its force and effect reach and bind the fund into
which the property has been converted."    *Gibson* v. *War-
den*, 14 Wall. 244.

" Whatever view may be taken of the agreement, there
can be no possible foundation for the other claim made by
the trustees to recover from Deford & Co. the amount
realized by the latter by a sale of the leather which they
had on hand when Brown & McKinney failed.    If this
leather did not belong to Deford & Co. under the contract
of July the 24th, it had been more than fully paid for by
advances previously made ; and Deford & Co. had the un-
doubted right to sell it, and to apply the net proceeds to
the reduction of the amount which Brown & McKinney
owed them.    We will accordingly sign an order directing
the auditor to allow in full, out of the proceeds of the
leather sold by the trustees, the claim of Deford & Co."

The cause was argued before BRYAN, BRISCOE, PAGE,
ROBERTS and BOYD, JJ.

*Wm. P. Maulsby, Jr.,* for the trustees.

The case of *Sixth Ward Bldg. Assn.* v. *Wilson,* 41 Md.
506, is, we submit, identical in principle with the case at
bar ; in the case in *41st Md.* the mortgages were on their

face equitable contracts equitably enforceable against all
save subsequent creditors without notice; here the contract
of July 24, when seen in the light of all the circumstances
proper to be known to understand it and its relations to
persons and things, is an attempt upon the part of a mer-
chant, insolvent, to apply by a secret lien a large part
of his property to an end absolutely in violation of the
policy of the laws of Maryland, that is, to the payment of
one creditor to the exclusion of the others, the manifest ob-
ject of the secrecy being to prevent the operation of the
insolvent law by its invocation within its limited period.

When it was made the firm had leather, hides and bark
on hand of the value of from $15,000 to $20,000 ; what be-
came of it ?    It was shipped to appellees as fast as it was
turned into leather; when received by Deford & Co. there
was paid upon the leather so received such part of its value
as Deford & Co. pleased ; the balance of its value was ap-
plied to the payment of the debt due Deford & Co.    What
became of the moneys paid on this leather shipped to ap-
pellees, to Brown & McKinney?    Why it was applied to
making more leather to be shipped in the same way.    Of
this second shipment when received, so much of its value
as the appellees pleased was paid to Brown & McKinney,
and so much as its value was beyond the amount paid to
Brown & McKinney, was credited on the indebtedness, the
original indebtedness due the appellees ; and so the process
went on, not one dollar was advanced by appellees except
on leather actually received by them, and so much of the
value of such leather so received by appellees as could be
kept back and yet not compel Brown & McKinney to close
down, was so kept back and applied to the payment of the
indebtedness due appellees July, 1888.    And this process
went on until the indebtedness of the Brown & McKinney
to the appellees, $9,170.36, on July 24th, 1888, had been
reduced to $5,618.16, May 19th, 1891, the date of the as-
signment, leather in the hands of Deford & Co. being cred-
ited in each instance.    The correspondence makes it, we

submit, demonstrably clear that not one dollar of the moneys of the appellees was advanced to Brown & McKinney, after July, 1888, for any purpose, but that part only of the value of the leather actually received was paid them and the balance was applied to the appellees' indebtedness as it existed July 24th, 1888.

And this was the whole scheme; to secure the possession of the stock of Brown & McKinney and to apply the same to the payment of the debt of the appellees gradually, but nevertheless surely, and to establish a lien on the property enforceable at any time. Is it the policy of the laws of Maryland that the property of an insolvent merchant shall be distributed equally among his creditors? " And any transfer of such debtor being then actually insolvent, or contemplating such insolvency, with the view to secure his property or any part of it to one or more of his creditors, and thus prevent an equal distribution among his creditors, is a transfer in fraud of the insolvent law." *Castleburg* v. *Wheeler*, 68 Md. 266–77.

The contract contemplated slow and gradual payment of appellee's debt; it was made to avoid insolvency proceedings and yet to effect a transfer in fraud of same; it was designed to hinder and prevent creditors using the legal remedy insolvency proceedings, by such slow transfer of Brown & McKinney's property to appellees in payment as would by its slowness and secrecy rob creditors of the remedy in insolvency. By its terms it conveyed instanter the property of Brown & McKinney, worth $20,000, for an absurdly insufficient consideration in the debt due appellees July, 1888, viz., $9,000.00; by its secrecy it prevented and hindered the creditors from the use of legal remedies; by its mode of performance, slowly and gradually drawing the stock in the hands of Brown & McKinney into their own hands in payment of the debt of July, of 1888, it defrauded the creditors of Brown & McKinney of their rights to the equal distribution of this property among the creditors of Brown & McKinney.

*Milton G. Urner* (with whom were *Clayton O. Keedy* and *Hammond Urner* on the brief), for the Farmers' & Mechanics' Nat. Bank :

At the time of the execution of the contract of July 24, Deford & Co. had *advanced* to Brown & McKinney $9,179.36 over and above all leather that had been consigned to them.   They desired security for their claim growing out of these *advances* and the claim reduced.   Mr. Thomas Deford accordingly prepared that contract, and mailed it to Brown & McKinney.   M. S. McKinney took the paper to Baltimore and signed the same.   The letter shows it had reference to the then subsisting claim of appellees.   The paper says in effect this money advanced was to be for the purpose of purchasing hides and bark " which *is* contained in the tannery and on the premises of Brown & McKinney, situated at Frederick, Md.,'' and that the said hides (those then in the tannery and on the premises of B. & McK.) were to be tanned into leather, the leather sent to Deford & Co. to be sold, &c., and after deducting commissions, &c., the net amount placed to the credit of B. & McK. *to pay the indebtedness due Deford & Co.*   " It is further understood that the hides and leather referred to above *is* the property of Deford & Co., and they *are* authorized at any time to come forward and take possession of the same." The paper referred to hides and bark then in the possession of Brown & McKinney.

The whole question is, whose property were the leather, hides and bark in possession of Brown & McKinney at the time of the assignment ?   The appellees claim they own it by virtue of B. F. D., No. 1, (the contract of July 24.) Such claim is directly in the face of the Registry Laws, especially sec. 40 of Art. 21 of the Code.   It is conceded the property in possession at the time of the assignment was not the same in existence July 24th, 1888, and was property after acquired.   If B. F. D., No. 1, had been a mortgage duly executed and recorded, would it have covered this after-acquired property ?   We think not.   *First. Nat. Bank*

v. *Lindenstruth*, 79 Md. 136; *Crocker* v. *Hopps*, 78 Md. 264; *Beall* v. *White*, 94 U. S. 382; *Mogg* v. *Baker*, 3 Mees. & Welsby, 198; *Chynoweth* v. *Tenny*, 10 Wis. 398; *Moody* v. *Wright*, 13 Metc. 32–33; *Otis* v. *Sill*, 8 Barb. 116–119, &c.

Where a mortgage is intended to cover after-acquired property to be valid (if it would be valid at all in this State, except in the cases of railroads), it must *expressly* state it includes after-acquired property. Nothing can be left to inference. *Jones on Chattel Mortgages*, sec. 173 A. The testimony shows the money paid Brown & McKinney by Deford & Co., after July 24th, 1888, on leather shipped, was used by B. & McK. for the general purposes of their business, paying expenses of every kind, and not simply for the purchase of hides and bark.

If the agreement with Deford & Co. was not such a contract applicable to after-acquired property as would entitle Deford & Co. to the aid of a Court of Equity for its specific enforcement against such after-acquired property, then Brown & McKinney could have successfully resisted such a claim by Deford & Co., and if they could have done so, a *fortiori*, their trustees, representing all their creditors, could certainly resist it, and it was their duty to do so. *Sixth Ward Bldg. Assoc.* v. *Willson*, 41 Md. 506. The settled policy of the law is not to uphold secret contrivances, the effect of which is to defraud creditors. *Gill* v. *Griffith & Schley*, 2 Md. Ch. Dec. 282; *Sixth Ward Bldg. Assoc.* v. *Willson*, 41 Md. 506; *Hoffman* v. *Gosnell*, 75 Md. 577; *Stanhope* v. *Dodge*, 52 Md. 483; *Person* v. *Oberterfer*, 59 How. Pr. Reps. 339; *Marsh* v. *Titus*, 6 N. Y. Sup. Ct. Rep. 29; (*Thompson & Cook*).

The audit and all the claims filed show that all the creditors whose claims come against the partnership assets are creditors subsequent to July 24th, 1888, the date of B. F. D., No. 1. The claim of the Farmers' and Mechanics' National Bank consists of four notes, each bearing date but a short time before the assignment. While it is true these

notes were given in renewal of previous notes and that the original loan was made prior to July 24th, 1888, yet a *new credit* was given when the present notes were taken; the taking of the new notes signed by the same makers was a payment of the old notes.

The order of the Court ratifying the audit and directing the trustees to pay interest to July 27th, 1895, was clearly erroneous. The funds out of which the claim was to be paid were the proceeds of the sale of leather tanned from hides and bark, the most of which were on hand at the time of the assignment. This leather had been promptly tanned and shipped to Deford & Co. for sale. They sold the same and sent the money to the trustees in January and April, 1892, after which the money was in Court bearing no interest. In fact, it never was in shape to bear or be chargeable with interest. The returns of Deford & Co. show they have already received $1,149.06 as commissions and interest on account of this leather. *Ellicott* v. *Ellicott*, 6 G. & J. 42; *Scott* v. *Amoss*, 72 Md. 86.

*John Prentiss Poe* (with whom was *J. Roger McSherry* on the brief), for the appellees, Deford & Co.

BRISCOE, J., delivered the opinion of the Court.

On the 19th of May, 1891, Henry C. Brown and Mathew S. McKinney, trading as Brown & McKinney, made an assignment of all their property to the appellants, Brown and Trail, in trust for the benefit of their creditors. This firm was engaged in the tanning business in Frederick, Maryland, and for some years prior to their failure shipped their leather to the appellees, Deford & Co., of Baltimore, who sold the same on commission, but permitted the consignors to draw drafts in advance of the sales of the leather. In this way, Brown & McKinney became largely indebted to Deford & Co., and on the 24th of July, 1888, the following agreement was entered into between the two firms :

"It is understood and agreed between Deford & Co., of Baltimore City, and Brown & McKinney, of Frederick City,

all in the State of Maryland, that all money advanced to Brown & McKinney by Deford & Co., *is for the purpose of purchasing hides and bark* which is contained in the tannery and on the premises of Brown & McKinney, situated at Frederick City, Md.; and that the said hides are to be tanned into leather, and the leather is to be sent to Deford & Co., Baltimore, to be sold on commission, and after Deford & Co. deduct their commissions and charges, the net amount is to be placed to the credit of Brown & McKinney to pay the indebtedness due Deford & Co.

"It is further understood that the hides and leather referred to above is the property of Deford & Co., and they are authorized at any time to come forward and take possession of the same, and there are no other parties furnishing us money for the purpose of buying hides or bark. Brown & McKinney. Baltimore, July 24th, 1888. We accept the above. Deford & Co. Witness: H. Hough, W. H. Russell."

It is admitted that there was at the time of the execution of the deed of trust a large balance due Deford & Co. which was, however, subsequently reduced to the sum of $5,631.28 by sales of leather then on hand and which had been shipped by Brown & McKinney. There was on the premises of Brown & McKinney, at the time of the assignment, a large number of hides, which were afterwards sold by an agreement between the parties, and the fund derived therefrom is now the subject of this controversy.

The appellees contend that the hides, in their green state, were purchased with money furnished by them, and under the terms of the contract of July 24th, 1888, continued their property at the time of the assignment to the trustees. This claim is, however, contested on the part of both the trustees and the Farmers' and Mechanics' National Bank, one of the creditors of Brown & McKinney. The sole question in the case, then, is whether the appellees are entitled to the fund, under the agreement of July, 1888, to the extent of their claim. By an agreement between the parties,

this fund is to be dealt with here, as if no sale of the property had taken place.

It is manifest that the trustees have no standing in a Court of Equity to contest the validity of the appellee's claim. Conventional trustees claiming under a deed of trust for the benefit of creditors cannot impeach a prior conveyance executed by his grantor, even though that conveyance be fraudulent against the grantor's creditors. They stand in the shoes of the assignor and take the property subject to all the equities against the assignor. *Ratcliff* v. *Sangston*, 18 Md. 391; *Devries* v. *Hiss*, 72 Md. 564; *Riley* v. *Carter*, 76 Md. 610.

There is nothing in the case of *The Building Association* v. *Willson*, 41 Md. 506, in conflict with this view as applicable to the facts of this case.

Nor can the contention that the agreement of July 24 is a fraudulent and prohibited preference under the insolvent law, and is, therefore, void against the trustees, avail them here. This is not a proceeding against Brown & McKinney under the insolvent law, nor have they applied for its benefit. In the case of *Castleberg* v. *Wheeler et al.*, 68 Md. 276, it was said that such conveyances and transfers as are here provided against, if in all other respects valid, are perfectly good if the debtor be not proceeded against or he does not become an applicant under the insolvent law within the time prescribed and is not declared an insolvent.

This brings us, then, to the main question in the case, and that is, what is the operation and effect of the agreement of July 24, 1888. Its validity could not be sustained, if in prejudice of subsequent creditors or purchasers in good faith, without notice. This, however, is not the case here. On the contrary, the proof shows that the bank, the contesting creditor, was such prior to the execution of the agreement. By the express terms of the contract the hides and leather to be purchased by Brown & McKinney were to be the property of Deford & Co., and they were authorized at any time to come forward and take possession of the same. And

it was further stipulated that there were no other parties furnishing them money for the purpose of buying hides or bark. " Now, it is a familiar principle," says this Court, in the case of *Roberts & Co.* v. *Bonaparte*, 73 Md. 204, " that Courts, in the construction of contracts, look to the language employed, the subject-matter and the surrounding circumstances." We think that under the contract of July 24th the stock on hand at the time of the assignment was the property of Deford & Co., and we fully concur with the learned Court below when it says : " In view of the construction placed upon this agreement by the parties themselves, as evidenced by their course of dealing and their conduct, and in view of the fact that the chief creditors of the extinct firm were such prior to the date of the agreement, we do not feel warranted in placing upon that agreement a construction or in giving to it an interpretation which will take the funds realized from a sale of the property bought with the money of Deford & Co., and will apply those funds ratably amongst pre-existing creditors, to the prejudice of Deford & Co. The agreement of July the 24th stands directly across the path of such a proceeding. Its force and effect reach and bind the fund into which the property has been converted." *Gibson* v. *Warden*, 14 Wall. 244.

For these reasons the order of Court passed on the 24th of July, 1895, directing the auditor, in stating an account, to allow in full the claim of Deford & Co. out of the funds in the hands of the trustees, will be affirmed on both appeals.

The appeal from the order passed on the 30th of November, 1895, allowing interest to Deford & Co. on the principal sum to the 27th of July, 1895, will also be affirmed. It is manifest that if the appellees were the owners of the property at the time of the assignment and the sale, they are entitled to interest thereon to the 27th of July, 1895.

The remaining appeal is from an order of the Court sustaining exceptions to testimony taken to the audit after the case had been submitted and decided. The order of the Court dated 27th of July, 1895, had been passed, directing

the claim of Deford & Co. to be paid.    There was no error in sustaining this exception.

It follows, then, that each of the orders appealed from will be affirmed, and the cause remanded with costs.

*Orders affirmed, with costs.*

(Decided March 27th, 1896).