EDWARD H. HAMMOND et al., Receivers, *v.* LYON REALTY COMPANY.

PETER E. VALE et al., Committee, *v.* LYON REALTY COMPANY.
[Nos. 1, 2, October Term, 1932.]

*Decided November 30th, 1932.*

443

The cause was argued before BOND, C. J., URNER, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*J. Morfit Mullen,* for the appellants.

*Sylvan Hayes Lauchheimer,* with whom were *Lauchheimer & Lauchheimer* on the brief, for the appellee.

An opinion was delivered *per Curiam* as follows:

A majority of the judges of the court have reached the conclusion that the orders appealed from in these cases must be affirmed, but there is no majority in agreement on any of the grounds leading to that conclusion; the orders must therefore be, and they are hereby, affirmed without an opinion for the court as a whole.

OFFUTT, J., filed an opinion as follows:

On October 8th, 1927, the Milburn Realty Company, a Maryland corporation, purchased from Caroline V. Richardson a tract of land known as "Glenleigh" containing about twenty-one acres on Glen Avenue near Park Heights Avenue in Baltimore City for $60,000, of which it paid in cash $20,000, and executed to the vendor a mortgage on "Glenleigh" to

secure the payment of the balance of the purchase price. The mortgage was in the form ordinarily employed under the Public Local Laws of Baltimore, matured in three years, contained provisions for a consent decree, and the usual covenants for the payment of taxes, charges, assessments, interest, and principal.

On January 6th, 1923, Joseph Berman, the Lyon Realty Company, and the Druid Realty Company, of the first part, and the Milburn Realty Company, of the second part, executed an agreement under which Berman, for himself and as president of the Lyon Realty Company, and the Druid Realty Company, agreed to furnish the Milburn Realty Company "at the rate of six per cent. per annum, such sums of money and at such times as I may deem necessary for the carrying on of the business of The Milburn Realty Company." In the same agreement the Milburn Company undertook to execute on demand a mortgage or mortgages pledging any of its property which Berman deemed adequate to secure such loans or advances.

On July 29th, 1930, in response to a demand made under that agreement, the Milburn Realty Company executed to the Lyon Realty Company a mortgage for $124,564.38 on its entire assets for loans or advances made to it from time to time by the Lyon Realty Company or the Druid Realty Company. And, on February 20th, 1931, in consideration of the release of certain land covered by that mortgage, the Milburn Realty Company executed to the Lyon Realty Company another mortgage for $35,000 (the portion of the first mortgage released) on two pieces of fee simple property included in that mortgage.

Caroline V. Richardson having been adjudicated a lunatic, and Nathaniel G. Grasty and Peter E. Vale having been appointed a committee of her estate, and the mortgage from the Milburn Realty Company to her being in default, on November 14th, 1930, that committee instituted in Baltimore City foreclosure proceedings to enforce the payment of a balance due under that mortgage "in excess of $38,000."

A sale of the property was in due course reported and ratified in that proceeding, and a deficiency decree entered therein in favor of the committee for $29,209.28 on July 29th, 1931.

On July 18th, 1931, petitions were filed for the foreclosure of the two mortgages from the Milburn Realty Company to the Lyon Realty Company, the case referring to the earlier being designated as case B and that referring to the later mortgage as case A. A sale was reported to the Beta Realty Company in case A of the property therein described for $705 subject to a first mortgage of $30,000, and in case B a sale was reported to the same purchaser of the property described in the mortgage filed in that case for $5,000, "subject to prior mortgages of $38,501.73."

On August 8th, 1931, the committee of Richardson filed in Circuit Court No. 2 of Baltimore City a bill of complaint against the Milburn Realty Company, in which it prayed that that corporation be dissolved, a receiver appointed, and its affairs wound up. As a result of further proceedings, Edward H. Hammond and Abraham Davidson were appointed receivers for the company, and on October 1st, 1931, it was dissolved and the receivers continued in charge of its assets, with authority "to institute any and all proper suits and actions, or to appear in any suits already pending in order to prosecute their rights as Receivers or on behalf of said corporation to any and all preferences, or to any and all claims or choses in action to which they as Receivers, or to which the said corporation have been or is or are now entitled."

On September 15th, 1931, the receivers filed exceptions to the sales reported in cases A and B, and on the following day similar exceptions were filed by the committee, both sets of exceptions being grounded on the proposition that the two mortgages to the Lyon Realty Company constituted an unlawful preference and were void. After the testimony and a hearing, those exceptions were overruled and the sales ratified. The appeals from those decrees were entered by the receivers and the committee, and after that, the Milburn Company

having been adjudicated a bankrupt, the appeals were prosecuted by the trustee in bankruptcy.

The questions growing out of the appeals may be thus stated: (1) Whether at the time the Milburn Company executed its B mortgage to the Lyon Realty Company it was in fact insolvent; (2) whether the mortgage to the Lyon Realty Company was in effect and for the purposes of this case a mortgage to Berman; (3) whether, if in fact it was insolvent, it could validly prefer Joseph Berman, one of its stockholders, who was also an officer and a director in it, over its general creditors; and (4) whether such preference can be avoided in this proceeding.

Since any consideration of those questions involves to some extent the relation in which Berman stood to each of the several corporations to which reference has been made, and as there is no dispute as to just what that relation was, that will be first stated.

The Milburn Realty Company was a Maryland corporation which conducted a real estate and construction business in Baltimore City, in the course of which it bought, sold, leased, mortgaged, and developed real estate. It issued fifty shares of stock, of which sixteen and one-half stood in the name of Joseph Berman, sixteen and one-half in the name of Harry M. Berman, his son, and seventeen in the name of Isaac Rosenberg, his son-in-law. Isaac Rosenberg was its president, Harry M. Berman, its secretary and treasurer, and they with Joseph Berman its board of directors.

The Lyon Realty Company was a corporation which was engaged in the business of operating the Riviera Apartments at Lake Drive and Linden Avenue in Baltimore, Md. It issued 500 shares of stock, 498 to Joseph Berman, and 1 each to Harry M. Berman and Isaac Rosenberg. Joseph Berman was its president and Harry M. Berman its secretary and treasurer, and they with Isaac Rosenberg its directors. Harry M. Berman was merely a nominal officer and the shares of stock which he and Rosenberg owned were mere qualifying shares indorsed "in blank back to Joseph Berman," so that

in fact he was the actual owner of all of the stock of that corporation.

The Beta Realty Company, a Maryland corporation, was also in the real estate business. It issued to Joseph Berman 248 shares of its stock, and to Harry M. Berman and Isaac Rosenberg, 1 share each. Harry M. Berman was its president, Isaac Rosenberg its secretary, and they with Joseph Berman its directors.

The Druid Realty Company, also a Maryland corporation, issued 189 shares of its stock to Joseph Berman, 10 shares to Harry M. Berman, and 1 share to Isaac Rosenberg. Joseph Berman was president of that company and Harry M. Berman its secretary and treasurer.

Reverting to the question first stated, the evidence permits no reasonable inference other than that on July 29th, 1930, the Milburn Realty Company was insolvent within any definition of that term by this court. Within the meaning of bankruptcy and insolvency statutes, insolvency has been held to mean the inability of a debtor to pay his debts when they accrue in the ordinary course of business. *Castleberg v. Wheeler,* 68 Md. 277, 12 A. 3. In *Strouse v. Amer. Credit Indemnity Co.,* 91 Md. 260, 46 A. 328, 330, 1063, an action on an indemnity bond, where liability depended upon the insolvency of debtors, it was said: "The insolvency designated is the usual legally defined 'insolvency,' which is an inability of the debtor to pay his debts as they fall due in the ordinary course of business, and this is dependent neither upon a formal adjudication, nor on an actual insufficiency of assets to meet liabilities." In *U. S. Fid. & Guar. Co. v. Williams,* 148 Md. 304, 129 A. 660, an action on an automobile casualty indemnity policy, it was held equivalent to "general financial irresponsibility." And it has been held to mean the insufficiency of the insolvent's assets when fairly appropriated and sold at their fair market value to pay his just debts. 3 *Words & Phrases,* First Series, 2648. The term is not therefore one of precise legal significance, but its meaning varies within somewhat narrow limits according to the facts to which it is applied. But whether it means inability to pay

debts as they accrue in the ordinary course of business, or the deficiency of the assets of the insolvent if sold at their fair market value to discharge his liabilties, the evidence in this case leads inevitably to the conclusion that on July 29th, 1930, the Milburn Realty Company was insolvent.

On November 7th of that year that company wrote Messrs. Mullen and Hammond in reference to an extension of the mortgage as follows:

"We are desirous of having this mortgage amounting to $37,079.00 extended for a period of two years. Due to present economic conditions, particularly with reference to real estate, we are unable at present time to pay the unpaid taxes for 1929 and 1930, and the six months interest which fell due on October 8th. We propose to pay the 1929 taxes at this time and the 1930 taxes during the year 1931, and further to pay the sum of $200.00 per month on account of the interest.

"We regret that we are unable to do better, but feel that the estate of Miss Richardson would be benefited if our proposition is accepted, rather than resorting to foreclosure proceedings."

At that time it owed the Lyon Realty Company $124,-564.38, the committee of Caroline V. Richardson an amount which with accumulated interest on November 14th, 1930, exceeded $38,000; it was also indebted to different creditors in amounts aggregating a substantial sum on notes and accounts payable, and its financial condition appears from these extracts from the testimony of Harry M. Berman, its secretary and treasurer: "Q. At that time you owed large sums that you were not able to pay? A. In the ordinary course of business, no, sir. Q. You did not owe a cent? A. No, I say we were not able to pay in the ordinary course of business, that is right. Q. That is what I am trying to get at. On October, 1930, you owed quite a large sum of money which you were unable to pay in the ordinary course of business? A. That is right. Q. Isn't the same thing true on July 29th, 1930? A. Approximately, yes. * * * Q. Let me

change my question; as I understood you to say, on July 29th, 1930, you did owe large sums of money. When I say 'you' I mean the Milburn Realty Company owed large sums of money which you were unable to pay in the ordinary course of business? A. That is partially true, yes, sir. * * * Q. Now, then, Mr. Berman, when the receivers took charge of the Milburn Realty Company, the only assets that they received—or, at least, were available, I won't say 'received,' were some furniture which, I believe the State Tax Commission appraised at $450 and which your company claimed was worth $250. That is one asset, isn't that so? A. That is correct. Q. There was not a cent in bank, the bank account was overdrawn, wasn't it? A. There wasn't anything in there; I don't know about being overdrawn. Q. And there are no accounts receivable, are there, that are any good? A. No, sir. Q. There is no physical property of the company at all? A. No, sir."

All the property covered by the Lyon Realty Company mortgage was sold for $5,705, and the "Glenleigh" property sold under foreclosure of the Richardson mortgage for $29,-209.28 less than the sum needed to pay that mortgage, accrued charges, and costs of foreclosure. So that the Milburn Realty Company was on July 29th, 1930, in financial distress, heavily indebted, unable to meet such immediate and pressing debts as taxes due on the Glenleigh property, with assets which proved wholly inadequate to pay the debts which it then owed, and was, within any accepted definition of the term, insolvent.

The second question is whether the mortgage to the Lyon Realty Company is to be regarded as a mortgage to Joseph Berman. Berman was the nominal owner of 498 of the 500 shares of the capital stock of the Lyon Realty Company and the actual owner of the entire issue. He therefore derived the identical benefit from the mortgage to the company that he would have derived had it been made directly to him, and, in fact, in the following extract from his testimony, he speaks of the Lyon Company and himself indifferently as signify-

ing the same person, when he said: "Most of the money the Milburn Company used to borrow was furnished through you and your companies? A. At times. In the first few years there was very little money I had to put up or lend to them. At times that I know of the books summed up to 1929, I believe, or 1930, they owed me at one time $30,000. They owed the Lyon Realty Company $30,000, and after that— that was, I think, in 1927 or 1928, I would have to refer to the statement—after that, in fact, one time they paid us over and above the amount that we had lent to them, and then later when times got hard, then I had—the Lyon Company had to lend them larger sums to pay their bills, and so forth and so on." And, while for all corporate functions a corporation is to be regarded as separate and distinct from its stockholders, yet where it is used as a mere device or contrivance to effect some personal purpose or design of a stockholder who controls it, the fiction of a distinct identity will not, in a court of equity at least, be permitted to defeat a just claim which could have been enforced against the stockholder had he stood in the place of the corporation. For a court of equity will look through the form to the substance beneath, and will not permit a mere fiction to validate a transaction which but for such fiction would be illegal, when recognition and acceptance of the fiction would result in injustice or would confer upon one relying upon the transaction an unfair advantage over others.

In *Swift v. Smith,* 65 Md. 428, 5 A. 534, it was intimated that ownership by one person of all the stock in a corporation virtually suspends its operations as a corporation until the election of new officers through new stockholders purchasing from that person. Whether in the light of more recent developments in the law the principle thus announced would be accepted now (*Dollar Dry Cleansers and Dyers, Inc., v. MacGregor,* 163 Md. 105, 161 A. 159), need not be decided, because the question here is not whether a one man corporation could as to all matters within the sphere of its legitimate corporate operations function as a corporation, but whether such a corporation can be used by its owner to escape the applica-

tion of legal rules and principles which would reach and control him as a natural person. And in reference to that question it was said in *Bauernschmidt v. Bauernschmidt,* 101 Md. 162, 60 A. 437, 442: "In *Anthony v. American Glucose Co.,* 146 N. Y. 407, 41 N. E. 23, the court said, 'We have of late refused to be always and utterly trammeled by the logic derived from corporate existence, when it only serves to distort or hide the truth;' and in *Seymour v. Spring* [144 N. Y. 333, 39 N. E. 365], *supra,* 'The abstraction of the corporate entity should never be allowed to bar out and prevent the real and obvious truth.' This principle was recognized and applied in a different situation in *Pott v. Schmucker,* 84 Md. 535, 36 A. 592, in which it was held that 'it was competent for a court of equity to look back of the mere artificial and formal body corporate, * * * and to treat the corporation and the individual owning all its stock and assets as identical.' " In *Fletcher's Cyclopedia of Corporations,* sec. 44, it is said: "It is idle to promote a corporation for the purpose of endeavoring to accomplish fraud or other illegal acts under the cloak of the corporate fiction. Where this is attempted, courts of law, equity, or bankruptcy, do not hesitate to tear aside the veil of corporate entity and to look beyond it and through it at the actual and substantial beneficiaries. A notable instance is found in cases where it is sought to delay, hinder and defraud creditors by means of 'dummy' incorporations. The courts have uniformly held that there is no magic in incorporation and refuse to apply the doctrine of corporate entity to enable such schemes to be successful."

In 14 *C. J.* 61, the same principle is expressed in this language: "Thus it has repeatedly been held that the courts, both at law and in equity, will disregard the fiction of corporate entity apart from the members of the corporation when it is attempted to be used as a means of accomplishing a fraud or an illegal act." The rule thus stated is generally accepted, and cases illustrating its application may be found collected in *Donovan v. Purtell,* 216 Ill. 629, 75 N. E. 334; 14 *C. J. "Corporations,"* secs. 5, 20, 21, 22, 25; *Fletcher's*

*Cyclopedia of Corporations,* secs. 43, 44; *Carozza v. Federal Finance Co.,* 149 Md. 223, 131 A. 332.

In considering the facts referred to above in connection with the third and controlling question, it will be assumed for the purposes of this case that, at the time the Milburn Realty Company mortgaged its entire assets to the Lyon Realty Company, it was insolvent, and that Joseph Berman and the Lyon Realty Company may be regarded as identical.

The third question in the case, which is whether the Milburn Realty Company, being insolvent, could lawfully prefer one of its directors over its general creditors in the distribution of its assets, is academic and moot unless the appellants are entitled to attack that preference in this proceeding.

That it would have been unlawful upon a seasonable application to avoid it appears settled by *Clark Co. v. Colton,* 91 Md. 195, 46 A. 386, 391. In that case a banking corporation, insolvent at the time, for the purpose of discharging obligations of certain of its directors who had notice of its insolvency, paid on the day before it closed its doors a certain promissory note which they had indorsed, and also paid another note due to a corporation in which the president of the bank owned nearly all the stock. In the course of the opinion filed in that case it was said: "In our opinion, fairness and justice require that the officers should be placed on an equality, and no more than an equality, with the other creditors of the corporation. And so, in the case of *Sutton Mfg. Co. v. Hutchinson* [(C. C. A.) 63 F. 496], *supra,* Harlan, J., says: 'It is, we think, the result of the cases that, where a private corporation is dissolved, or becomes insolvent, and determines to discontinue the prosecution of business, its property is affected by an equitable lien or trust for the benefit of creditors. The duty in such cases of preserving it for creditors rests upon the directors or officers to whom has been committed the authority to control and manage its affairs. Although such directors and officers are not technical trustees, they hold, in respect of the property under their control, a fiduciary relation to creditors; and, necessarily, in the disposition of the property of an insolvent corporation,

all creditors are equal in rights, unless preference or priority has been legally given by statute or by the act of the corporation to particular creditors.' * * * Certainly one of the interests of every corporation is that, while solvent, all its creditors should be fully paid, and, when insolvent, that all its assets should be equally divided, and not awarded by the president and directors or other officers to themselves and their friends."

That statement of the law agrees with the rule which Fletcher, in the following statement from his *Cyclopedia of Corporations* (Rev. Ed.), secs. 7468, 7469, says is supported by the "great weight of authority": "When a corporation becomes insolvent and can no longer continue in business, the directors and other managing officers occupy a fiduciary relation towards creditors by reason of their position and their custody of the assets, and they cannot, by conveyance, mortgage, pledge, confession of judgment, or otherwise secure to themselves, as creditors, any preference or advantage over other creditors, but the most that they can claim is the right to come in and share *pro rata* with the other creditors in the distribution of the assets. This is the rule sustained by the great weight of authority, and the fiduciary relation occupied by the officers results from their duty to wind up the affairs of an insolvent corporation and pay the debts incurred. As was said in one case, 'while the directors and officers of a corporation, solvent or insolvent, are not in any proper sense the trustees of the creditors, they do occupy a relation to them demanding the utmost good faith on their part in the handling of the coporation assets. To their honest and fair dealing with the property and to their just and prudent management of the business, the creditors must look for their continued security. As in the case of others occupying a fiduciary position, they cannot innocently sacrifice the interest of those who trust them to their own personal advantage. As managers of the corporation and its property, they owe a duty to those dealing with them, which they violate when, to the detriment of those who confide in them, they make themselves preferred beneficiaries in the disposition of assets

which, without such preference, would be available alike to all creditors.' "

The rule as thus stated is in accord with the trend and weight of current authority elsewhere (74 *A. L. R.* 940; *Jackson v. Newbold* [C. C. A.], 28 Fed. [2nd] 107; *Baird v. First Nat. Bank,* 55 N. D. 856, 215 N. W. 810; *Lyness v. Kuske,* 54 N. D. 479, 209 N. W. 993; *Nelson v. Jones,* 38 Idaho, 664, 224 P. 435; 19 *A. L. R.* 334), and, as far as it characterizes a transaction between an insolvent corporation and its officers under which they obtain a preference, it seems in accord with such cases as *Bartlett v. Smith,* 162 Md. 478, 160 A. 440, 442; *Macgill v. Macgill,* 135 Md. 384, 109 A. 72.

The vital and controlling question in the case, however, is, whether, assuming that the mortgage to the Lyon Realty Company was preferential, it is such a preference as may be attacked in this proceeding and at this time.

The ground of the attack is not that the mortgage was a fraudulent conveyance, for it is not disputed that the consideration named in it was for an actual antecedent indebtedness, but that it was an unlawful preference. The general rule is that, unless restrained by statute, a corporation has the same right to prefer creditors as a natural person (*In re Lake Chelan Land Co.* [C. C. A.], 257 Fed. 497; *Mowen v. Nitsch,* 103 Md. 587, 62 A. 582; *Fletcher, Cyclopedia Corporations,* sec. 5074), and at common law, in the absence of fraud or an intent to hinder and delay creditors, a debtor had the right to prefer one creditor to another. *Cole v. Albers,* 1 Gill, 422; *Foley v. Bitter,* 34 Md. 646; *Drury v. State Capital Bank,* 163 Md. 84, 161 A. 176. So that, if the mortgage is to be avoided simply as a preference, it must be by the force of some statute or because fraud in fact may be inferred from the mere fact that the preference was to an officer of the corporation. But the only statutes applicable are Code, art. 23, sec. 94, which in part provides that "whenever any corporation shall be dissolved by the decree of any court of this State, its property shall vest in its receivers appointed and named therein, and all preferences, payments and transfers, howsoever made by it or by any of

its officers on its behalf, which would be void or fraudulent under the provisions of the insolvency laws of this State, if made by a natural person, shall to the like extent and with like remedies be fraudulent and void; and for the purpose of setting aside such preferences, payments and transfers, the receiver of such corporation shall have all the powers vested in the permanent trustee of an insolvent debtor and the date of the filing of the petition or bill by or against such corporation shall, for the purpose of determining the validity of preferences and for all other purposes, be treated as the date of the filing of the petition in insolvency by or against a natural person," and Code, art. 47, sec. 14, which provides that "no deed or conveyance executed, or lien created by any person being insolvent or in contemplation of insolvency, save as hereinafter provided, shall be lawful or valid if the same shall contain any preference, * * * provided, the grantor or party creating said lien or preference shall be proceeded against under section 23 of this article, or shall apply for the benefit of this article under section 1 within four months after the recording of the deed or conveyance or the creation of said lien or preference, and shall be declared or shall become, under the provisions of this article, an insolvent."

Taking these statutes together, the only cases in which statutory receivers may, under their authority, move to avoid a preference by a corporation are those in which the petition or bill is filed within four months from the recording of the conveyance creating it. In this case there is no bill or petition directly attacking the supposed preference, but the question is raised by exceptions to sales made in the course of foreclosure proceedings instituted to collect the debt secured by the mortgages attacked as preferential. Those exceptions were filed both by the receivers of the Milburn Realty Company and by the committee of Caroline V. Richardson. If the exceptions filed by the receivers are given the same force and effect which would be given a bill or petition filed by them to avoid the preference, and there is no apparent theory under which the receivers would have greater rights in such a proceeding as this than if they had proceeded directly to

strike down the preference, it is manifest that the mortgages to the Lyon Realty Company are not affected by these statutes, for the exceptions to the foreclosure sales and the bill to dissolve the Milburn Realty Company were all filed more than a year after the mortgages had been recorded.

But it is contended that the case of *Clark Co. v. Colton,* 91 Md. 195, 46 A. 386, 389, is authority for the proposition that the receivers have the right to ask that the mortgages be avoided, irrespective of statutory authority, on the theory that a court of equity has inherently the power to avoid any preference by an insolvent corporation to its officers, and it may be said that that case lends some support to that contention. There were in it two decisive issues: (1) Whether the payments in question had been made at a time when the bank was insolvent, and (2) whether such payments constituted unlawful preferences within the meaning of the insolvent law. Both of those issues were decided in the affirmative, and that decision disposed of the case. But, after having decided those issues, the court announced that it would discuss "the question whether, apart from the insolvent law, a court of equity will recognize them as fair and equitable payments," and it reached the conclusion that payment by an insolvent corporation of a debt owed by it to one of its directors in preference to other creditors constitutes an unlawful preference which may be avoided in a court of equity without regard to statute.

The authority of that statement was shaken, however, by the decision in *Mowen v. Nitsch,* 103 Md. 687, 62 A. 582, 583, where it was said: "Whilst apart from the provisions of the insolvent laws and the terms of section 377, art. 23 of the Code, the mere fact that a corporation debtor is insolvent will not prevent it from securing a pre-existing creditor by giving to the latter a priority over other creditors, if the transaction be made in good faith, upon a valid consideration, and without a fraudulent intent; yet if the security given was without consideration, or was created with a view to hinder and delay creditors it will not be permitted to stand when properly assailed." The distinction resulting

from the decision in *Mowen v. Nitsch* between a preference under the insolvency law and a fraudulent conveyance is also apparent in the later decision, in *Hughes v. Hall,* 118 Md. 673, 85 A. 946, 948, that the ordinary chancery receiver cannot sue to set aside an unlawful preference, where the court said:

"But in considering section 54, which relates expressly to cases of dissolution under a decree of court, and provides that in such cases the property of the corporation shall vest in its receivers 'named and appointed therein,' the court said: 'This vesting in the receiver is thus made the legal consequence of a decree of dissolution'—that is to say, that, when the dissolution prayed for has been decreed, then, by virtue of such decree, the receiver is vested with the powers of a permanent trustee in insolvency, and may ask that unlawful preferences be set aside, just as was said in *Mowen v. Nitsch, supra*: 'It is under sections 376 and 377 of article 23 of Code of 1904, and section 22 of article 47, that proceedings must be had to set aside or avoid a prohibited preference.'

"Whatever support might be derived from the case of *Clark v. Colton,* 91 Md. 195, 46 A. 386, for the argument of the appellants, if that were the last word upon the subject, it cannot be successfully contended, since the decisions in *Mowen v. Nitsch* and *Hughes v. Hall & Spring* (117 Md. 547, 83 A. 1023) that a prior decree of dissolution is not essential to the maintenance of a bill by a receiver to set aside an unlawful preference."

The cases of *Macgill v. Macgill,* 135 Md. 384, 109 A. 72; *Mundy v. Jacques,* 116 Md. 11, 81 A. 289; *Dollar Dry Cleansers & Dyers v. MacGregor,* 163 Md. 105, 161 A. 159, and *Bartlett v. Smith,* 162 Md. 478, 160 A. 440, relied upon in support of the *dictum* in *Clark v. Colton, supra,* are hardly in point. *Macgill v. Macgill* and *Dollar Dry Cleansers & Dyers v. MacGregor* turned on the question of actual fraud, as did *Mundy v. Jacques,* and *Bartlett v. Smith* raised the question of the right of the receiver of an insolvent corpora-

tion to recover, under the provisions of a Delaware statute, dividends paid to its stockholders.

So that, even if it were conceded that the *dictum* in *Clark v. Colton* is consistent with natural justice and equity, and in harmony with the weight of authority elsewhere, nevertheless it is not, since *Hughes v. Hall, supra,* the law in this state. In that case the bill was filed by receivers appointed in a proceeding' brought to dissolve a corporation but in which no actual decree of dissolution had been filed. But while the appellants were not statutory receivers to wind up the affairs of the corporation, they were at least chancery receivers and expressly authorized to bring that suit. The purpose of the bill was to set aside preferential payments made by an insolvent corporation to one who was its president and a director and stockholder in it. Upon those facts the bill was dismissed on the ground that, since there had been no decree of dissolution, the receivers were not entitled to assert or rely upon the rights granted by Code, art. 23, sec. 94, to receivers appointed after the dissolution of a corporation to wind up its affairs. And in dismissing the bill it was necessarily decided that apart from that statute a court of equity had not the power to entertain a suit to avoid a preference by an insolvent corporation to a creditor who was also its president, a director, and one of its stockholders.

The reasoning upon which that conclusion rests and which, of course, is the antithesis of that of the majority opinion in *Clark v. Colton, supra,* is thus expressed by Mr. Justice Brewer in *Sanford Fork & Tool Co. v. Howe, Brown & Co.,* 157 U. S. 312, 15 S. Ct. 621, 623, 39 L. Ed. 713: "Can it be that if, at any given time in the history of a corporation engaged in business, the market value of its property is in fact less than the amount of its indebtedness, the directors, no matter what they believe as to such value, or what their expectations as to the success of the business, act at their own peril in taking to themselves indemnity for the further use of their credit in behalf of the corporation? Is it a duty resting upon them to immediately stop business, and close up the affairs of the corporation? Surely, a doctrine like

that would stand in the way of the development of almost any new enterprise. It is a familiar fact that in the early days of any manufacturing establishment, and before its business has become fully developed, the value of the plant is less than the amount of money which it has cost; and, if the directors cannot indemnify themselves for the continued use of their personal credit for the benefit of the corporation, many such enterprises must stop at their very beginning."

The effect of *Hughes v. Hall, supra,* upon the issues in this case must be measured not only by what the court said in that case but by what it decided. It was alleged in the bill filed in it, and conceded by demurrer, that, at a time when to his knowledge it was insolvent, the corporation made payments to Hall who was its president and one of its directors on account of an antecedent indebtedness owed to him by it, thereby preferring him to other creditors whose claims at the time the bill was filed remained unpaid. Upon those facts the court decided: (1) That, since there had been no decree of dissolution, the receivers were "ordinary chancery receivers"; (2) that as such, upon the authority of *Gaither v. Stockbridge,* 67 Md. 224, 9 A. 632, 10 A. 309, they had "no estate" in the property but were mere custodians of it for the court; (3) that they could only have acquired title to it by force of a decree of dissolution; (4) that having no such title they had no standing to attack the payments as preferential; and (5) that as "ordinary chancery receivers" they could not maintain the bill, which was accordingly dismissed. In connection with those conclusions it must be noted that, if the receivers had in fact taken title as a result of a decree of dissolution, they could only have attacked preferential transactions within the time limited by the statute. *Castleberg v. Wheeler,* 68 Md. 266, 12 A. 3. But either as chancery receivers in a creditors' suit to avoid a fraudulent conveyance (*Tardy's Smith on Receivers,* sec. 273; *Haight v. Burr,* 19 Md. 130; *High on Receivers,* sec. 314 *et seq.*), or as receivers to wind up the affairs of an insolvent corporation under the statute (*Applegarth v. Wagner,* 86 Md. 468, 38 A. 940; Code, art. 47, sec. 8; *Ensor v. Keech,* 64 Md. 382, 1 A. 756; *Waters v.*

*Dashiell,* 1 Md. 472), they would have had the right to re-
cover the payments made to Hall if they were fraudulent in
fact. The only evidence of fraud in that case, and the only
evidence of fraud in this case, is the inference to be drawn
from the facts that the payments in that case and the mort-
gage in this were to an officer of the corporation to settle an
antecedent indebtedness, and made at a time when to the
knowledge of the creditor the corporation was insolvent.
Therefore, it was necessarily held in that case (*Hughes v.
Hall*), that whatever inferences might be drawn from such
preferences were not sufficient to show fraud in fact, for upon
no other theory could the bill have been dismissed.

This case differs from *Hughes v. Hall* in that here the
corporation has been actually dissolved and title to all its
assets vested first in the receivers and eventually in the trus-
tee in bankruptcy. But the only effect of that adjudication
was to confer upon the receivers the authority to attack any
payment, transfer, or preference made by the corporation'
which would have been void under the insolvency laws if
made by an individual. Code, art. 47, sec. 8, does provide
that: "Any confession of judgment, and any conveyance or
assignment made by any insolvent under this article, for the
purpose of defrauding his creditors or giving an undue pref-
erence, shall be void, and the property or thing conveyed or
assigned shall vest in the trustee." But it was said in
*Williams v. Cohen,* 25 Md. 486: "Our conclusion is, that
this section contemplates as void or voidable, only such acts
of a debtor in derogation of the rights of his creditors as
may be done by him when he knows or believes himself to
be insolvent, and has no reasonable expectation of exempting
himself from execution without the aid of the insolvent laws,
or expressing the same proposition in equivalent terms, only
such acts as the debtor may be presumed to have done in
derogation of the rights of his creditors, with a view of ap-
plying for the benefit of the insolvent laws. The provision
in question was codified from the Act of 1854, chap. 193, sec.
7, which in substance and effect is the same as the 6th section
of the Act of 1816, chap. 221, and the construction given to

it here corresponds with that given to the Act of 1816, in the cases of *Hickley v. Farmers' Bank,* 5 G. & J. 377; *Crawfords v. Taylor,* 6 G. & J. 323, and *Dulaney v. Hoffman,* 7 G. & J. 170.

So that, in so far as the immediate question is affected, the only additional authority conferred upon the receivers by the decree of dissolution was to attack acts of the debtor done in contemplation of taking the benefit of the insolvent laws, for the powers of a trustee under the insolvency laws is made the measure of the powers of receivers appointed to wind up the affairs of a corporation after a decree of dissolution. And the test of the power of the receivers in this case to attack the mortgages from the Milburn Realty Company to the Lyon Realty Company is whether they were executed in derogation of the rights of creditors of the corporation with a view "of applying for the benefit of the insolvent laws." *Id.* The insolvent laws of this state, in so far as they apply to such a corporation as the Milburn Realty Company, while suspended by the National Bankrupt Act (*Remington on Bankruptcy,* secs. 2106, 2107, 2108; *U. S. C. A.,* title 11, page 6 *et seq.*), remain in abeyance and have not been totally destroyed (*Id.*), and, as to classes of insolvents not included in the federal act, the state laws remain in full force and effect. *Old Town Bank v. McCormick,* 96 Md. 341, 53 A. 934. But whether suspended or not, they may nevertheless be used as a measure or scale to fix the extent of the court's jurisdiction, as was done in Code, art. 23, sec. 94, and, when so used, should be given a reasonable construction to effect the purpose of the statute in which they were adopted as such measure or scale. When thus construed, "insolvency," as used in Code, art. 47, sec. 8, should be regarded as the equivalent of "bankruptcy" as used in the Federal Bankruptcy Law (11 U. S. C. A.), which superseded it, or as applied to the hypothesis that the state insolvency law, in so far as it is invoked as a means for interpreting Code, art. 23, sec. 94, is still in effect. Thus considered, it cannot be said upon the evidence in this case that the mortgages were fraudulent under the statute, because it does not appear

that they were executed "with a view of applying for the benefit of the insolvent laws," since, as interpreted in *Williams v. Cohen, supra,* both insolvency and an intent to apply for the benefit of the insolvency laws must concur to justify an inference of fraud in fact within the meaning of the statute.

And while the principle that fraud in fact may not be inferred from the conveyance by an insolvent corporation of its assets to a creditor who is one of its officers is opposed to the trend and weight of authority elsewhere [*Fletcher, Cyclopedia of Corporations* (Rev. Ed.), 7469], nevertheless it must be accepted upon the authority of *Hughes v. Hall, supra,* as the law of this state, and it is supported by a respectable volume of decisions in other jurisdictions. *Id.,* sec. 7470; *Rose's Notes on U. S. Reports,* vol. 17, p. 148. And if it is to be changed, it should be changed by the Legislature and not by the courts.

In this case there is to be found nothing sufficient to stamp the transaction between Berman and the corporation as fraudulent in fact, except such inferences as may be drawn from his relation to it, nor can it be said as a fact that the conveyances were to hinder or delay creditors, or that they were fraudulent conveyances. It was conceded that the consideration was *bona fide,* and it was not disputed or questioned that the mortgages were made in the performance of an agreement of long standing. But, as stated above, in the present state of the law in this state, while the fact that the mortgages were executed by the corporation when it was insolvent to one of its officers would be sufficient to prove an unlawful preference, it is not sufficient proof of the fraud required to characterize them as fraudulent conveyances. And since they were not attacked as unlawful preferences within the time limited by the statute, they cannot be attacked now as fraudulent conveyances, merely because the creditors of the corporation failed to make seasonable use of the remedies which the statute afforded them.

For the reasons stated, in the opinion of the writer and Judge Sloan, the decree should be affirmed.

Parke, J., filed the following opinion, in which Bond, C. J., and Urner, J., concurred:

As indicated by the *per curiam* opinion, the five judges who concur in an affirmance do so upon distinct grounds, in none of which a sufficient number agree to constitute a majority. In this situation, Offutt, J., has set forth his views in a full and forceful manner and Sloan, J., wholly concurs in them. In view of the division of the court and of the importance of the questions involved, the writer of this opinion believes a statement of his position should, with deference for the convictions of his brethren, be expressed.

The two appeals on the record are from the decrees of the chancellor dismissing the exceptions to the ratification of two separate sales made by a trustee in mortgage foreclosure proceedings and finally confirming the sales. The mortgagor, in both instances, is the Milburn Realty Company, a corporation; and the Lyon Realty Company, a corporation, is the mortgagee in both deeds of mortgage. The exceptants are the personal representatives of a general lien creditor under a decree obtained against the mortgagor, after the execution of the two mortgages, for the amount of the deficit arising from the foreclosure of a first mortgage lien held against the mortgagor by the creditor, and the receivers of the mortgagor under a decree of the Circuit Court No. 2 of Baltimore City, passed in proceedings for the dissolution of the corporate mortgagor, and the complete administration of its assets. There is no exception on the ground of an irregularity or defect in the foreclosure proceedings or in the making of the sale; nor because of an inadequate purchase price. The sole objection to the sales is the alleged invalidity of each of the deeds of mortgage. The lienor under a judgment or a decree usually has the right to object on this ground, and so would his committee in lunacy or other personal representative. *Miller's Equity Proc.*, sec. 468; *Albert v. Hamilton*, 76 Md. 304, 307, 308, 25 A. 341; *Bentley v. Beacham*, 91 Md. 677, 679, 47 A. 1024; *Bainder v. Sound Bldg. & Loan Assn.*, 161 Md. 597, 604, 158 A. 2. The exceptions on the part of the creditor under the decree in equity are, however, super-

seded in these procedings by those of the receivers for the dissolution of the corporation and the winding up of its affairs, since the receivers here represent the corporation, its stockholders, and creditors. *Infra; Machen on Corporations,* sec. 1594.

One of the major questions is the right of the receivers to except, and this will be the first question considered. The receivers in this cause did not have the status of mere custodians under the court, but were, at the time of the authorization by the court and the filing of the exceptions to the ratifications of the sales, receivers to wind up the affairs of the mortgagor as an insolvent corporation, under a decree which had been passed in a suit instituted by a creditor for an involuntary dissolution, and which had resulted in a decree of dissolution that had conferred upon the receivers full powers of administration. Code, art. 23, sec. 92. The powers of such statutory receivers are greater than those of the ordinary receiver of a court of chancery, whose duties are generally limited to those of a conservator of assets. *Gaither v. Stockbridge,* 67 Md. 224, 9 A. 632, 10 A. 309. Compare *Prentiss Co. v. Whitman Co.,* 88 Md. 243, 41 A. 49; *Clark Co. v. Colton,* 91 Md. 202, 46 A. 386; *Knave v. Johnson,* 107 Md. 620, 69 A. 420. The statutory powers are, however, not to be taken in limitation of the usual powers and duties of a chancery receiver, but in addition. This is illustrated by the case of *Mowen et al., Receivers, v. Nitsch,* 103 Md. 685, 62 A. 582, 583, where it is found among the memoranda of cases designated by the court not to be reported. A resort to the record of that case will disclose that the original bill was begun in Baltimore County by certain creditors of an insolvent corporation for the benefit of themselves and of all other creditors who would come in and participate in the proceedings. The bill of complaint was for the appointment of a receiver, the dissolution of the corporation, and for general relief. The court appointed receivers to take charge of all the books, property, and assets of every kind and description until the further order of the court. In the course of the administration, the receivers ap-

plied for and obtained an order directing them to institute a suit to set aside a mortgage deed which the defendant corporation had executed to a third party. This suit was begun, and much testimony was taken, and the cause was submitted to the late Judge Nicholas Charles Burke, then an able member of this court. At the time of the hearing no decree of dissolution had been made in the primary suit; and the receivers had been appointed in the exercise of the general powers of a court of chancery upon the allegations of the bill of complaint and the admissions of the answer. The assailed mortgage deed had been delivered for a past due debt, at a time when the corporation was insolvent, and within four months preceding the filing of the creditors' bill against the corporation. The chancellor held that, as neither the principal office or place of business of the corporation was located in Baltimore County, nor its certificate of incorporation there recorded, the court had no jurisdiction to determine whether or not the mortgage was an unlawful preference within sections 376 and 377 of article 23 of the Code of 1904 (now sections 88, 92, 94 of article 23 of the Code of 1924) ; and decided that the only question which the court could entertain was whether or not the mortgage was void under Statute 13 Elizabeth, ch. 5. His decision on this point was in the negative, and on appeal the decree was reversed upon the express ground that the facts did show, contrary to the determination of the chancellor, that the mortgage was fraudulent and void under the Statute of 13 Elizabeth, ch. 5. Before proceeding to the ground of the decision, McSherry, C. J., writing for the court, stated that the provision of the insolvent law against the creation of an unlawful preference (now article 23, section 94 of the Code) "is engrafted on the jurisdiction of a court of equity precisely as though the same provision had been independently enacted in identically the same words without any allusion whatever to the insolvent laws."

The effect of this decision is that each of the two mortgages at bar might have been avoided by the receivers on the ground of its being an unlawful preference, or a fraudulent

conveyance within the meaning of the Statute of 13 Elizabeth, ch. 5, as now codified in article 39B of Code; or an actual fraud, as denounced upon equitable principles. If the mortgages are to be attacked as unlawful preferences of an insolvent corporate debtor, the prescribed statutory proceedings for a dissolution must have been instituted within four months after the preferences had been made and have resulted in a decree dissolving the corporation and naming a receiver. *Supra.* Since the bill of complaint for the dissolution of the mortgagor was not filed within four months after the execution of the mortgages, they cannot be set aside as unlawful preferences, and must be given effect according to their tenor, unless the mortgages are void either as fraudulent conveyances within the meaning of the Statute of 13 Elizabeth, ch. 5 (codified in Code, art. 39B), or as actually or constructively fraudulent, independently of the Statute of Elizabeth, within the meaning and denunciation of equitable principles. *Colton v. Mayer,* 90 Md. 712, 713, 45 A. 874; *Clark Co. v. Colton,* 91 Md. 195, 46 A. 386; *Folsom v. Detrick Fertilizer Co.,* 85 Md. 52, 36 A. 446; *Stockbridge v. Franklin Bank,* 86 Md. 189, 200, 37 A. 645. See *Diggs v. McCullough,* 69 Md. 592, 609, see page 613, 16 A. 453; *Mundy v. Jacques,* 116 Md. 11, 16, 17, 81 A. 289; *Merchants' Bank v. Page,* 147 Md. 609, 128 A. 272.

Aside from the provisions of the statute law with respect to unlawful preferences, the mere fact that a corporation debtor is insolvent will not prevent it from securing a preexisting creditor by giving the latter a priority over other creditors, if the transaction be made in good faith, upon a valid consideration and without a fraudulent intent to hinder and delay creditors, knowingly participated in by the debtor and creditor. *Mowen et al., Receivers, v. Nitsch,* 103 Md. 687, 688, 62 A. 582; *Crooks v. Brydon,* 93 Md. 640, 642-644, 49 A. 921; *Totten v. Brady,* 54 Md. 170, 173; *Castleberg v. Wheeler,* 68 Md. 266, 275, 12 A. 3; *Smith v. Pattison,* 84 Md. 341, 35 A. 963; *Commonwealth Bank v. Kearns,* 100 Md. 202, 207, 208, 59 A. 1010; *Thompson v. Williams,* 100 Md. 195-199, 60 A. 26; *Busey v. Reese,* 38 Md. 264,

268, 269; *McCauley v. Shockey,* 105 Md. 641, 646, 66 A. 625. So, an insolvent corporation, unless restricted by statute or by its charter, may prefer one creditor over others or one class of creditors over other classes. *Cook on Corporations* (8th Ed.), sec. 691; *State v. Bank of Maryland,* 6 G. & J. 205, 219.

Hence, if the directors of a corporation pay or secure a pre-existing debt due one of its directors or a creditor corporation which has all or a majority of directors in common with the debtor corporation, in preference to debts due others, either by transferring property or cash to the creditor or by giving the creditor a mortgage on corporate assets, the transaction is not void, but is voidable unless sustained by a full and valuable consideration and shown to have been free of actual fraud. By reason of the relation of the corporation and the creditor, the transaction is presumptively fraudulent, and this presumption becomes stronger, but not necessarily conclusive, should the corporation be insolvent or in contemplation of insolvency at the time of the transaction. *Clark Co. v. Colton,* 91 Md. 195, 46 A. 386; *Mowen et al., Receivers, v. Nitsch,* 103 Md. 687, 62 A. 582; *Macgill v. Macgill,* 135 Md. 384, 109 A. 72; *Cumberland Coal & Iron Co. v. Parish,* 42 Md. 598; *Booth v. Robinson,* 55 Md. 419; *Welbourn v. Kleinle,* 92 Md. 114, 48 A. 81; *Pennsylvania Ry. Co. v. Minis,* 120 Md. 461, 484-486, 87 A. 1062; *Davis v. U. S. Elec. Lt. & Pow. Co.,* 77 Md. 35, 41, 25 A. 982; *Hagerstown Mfg. Co. v. Keedy,* 91 Md. 430, 46 A. 965; *Shaw v. Davis,* 78 Md. 318, 28 A. 619.

The numerical weight of precedent supports the contrary view, that the transaction is voidable by the stockholders and by those authorized to act in behalf of the corporation, without regard to the good faith of the participants, the fullest disclosure, the adequacy of the consideration, and whether or not the terms of the transaction are executory or executed. *France on Corporations* (2nd Ed.), sec. 65, p. 106; *Cook on Corporations* (8th Ed.), sec. 692; *Machen on Corporations,* sec. 1563. The decisions of this court do not accept this statement as the general principle governing the subject, but

apply the first stated principle, which permits the transaction to stand, provided the fiduciary meets the burden of proof and shows the utmost fairness and the fullest disclosure. This is illustrated by the appeal of *Clark Co. v. Colton,* 91 Md. 195, 46 A. 386. In that case the receivers of an insolvent bank had repudiated certain transactions of their corporation with its president and directors, whereby these officers of the corporation had caused the corporation to pay in full a check on the bank of a corporation of which the president of the bank was the substantial owner and a note on which the president and directors were bound as sureties. The court did not here hold that the two payments were voidable on these facts, upon the principle that no trustee, agent or other fiduciary is permitted to contract with himself or to represent his principal or *cestui que trust* in any transaction in which he has a private conflicting interest, but recognized and applied the first stated general principle and examined the record for the purpose of seeing if the transactions might stand because the proof would show them "as fair and equitable payments." Page 209 of 91 Md., 46 A. 386, 389. There was much written, *arguendo,* in the opinion, but the decision ultimately depended upon the failure of the fiduciaries to establish the good faith of the transactions. The facts were that "the payments were made when the corporation was actually insolvent, and under circumstances which convince us that the directors know or were bound to know the bank was hopelessly insolvent, and would, as it did, the very next business day after the payments were made, close its doors, and deny admittance to its depositors who wished to withdraw their deposits." Page 215 of 91 Md., 46 A. 386, 392. In short, the transactions were declared properly avoided, because they were not in the utmost good faith but for the purpose of defrauding other creditors. *Machen on Corporations,* secs. 1563, 1594. Again, in *Hughes v. Hall,* 118 Md. 673, 85 A. 946, where the director and president of an insolvent corporation secured, with knowledge of the insolvency, a preference for himself by causing payments to be made to him from time to time on account of the corporate

indebtedness to him, it was determined that relief would not be afforded upon general equitable principles but must be sought under the statutory provision against an unlawful preference. Page 680 of 118 Md., 85 A. 946.

In reference to the same subject-matter, in *Cumberland Coal Co. v. Parish,* 42 Md. 598, 606, 607, Judge Alvey wrote:

"The design of the rule, therefore, is to secure a faithful discharge of duty, and, at the same time, to close the door, as far as possible, against all temptation to do wrong, by subjecting the transaction between parties standing in such confidential relations, to the most exact and rigid scrutiny, whenever such transactions are brought in question before the courts.

"The transaction may not be *ipso facto* void, but it is not necessary to establish that there has been actual fraud or imposition practiced by the party holding the confidential fiduciary relation;—the onus of proof being upon him to establish the perfect fairness, adequacy, and equity of the transaction; and that too by proof entirely independent of the instrument under which he may claim. This is required, upon the general principle, 'that he who bargains in a matter of advantage with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence; a rule applying equally to all persons standing in confidential relations with each other. If no such proof is established, courts of equity treat the case as one of constructive fraud.' 1 *Story Eq. Juris.,* sec. 311, and also secs. 321, 322; *Pairo v. Vickery,* 37 Md. 467."

See *Booth v. Robinson,* 55 Md. 419, 441, 442, in which *Hoffman Steam Coal Co. v. Cumberland Coal Co.,* 16 Md. 456, 506, 507, is cited and interpreted; *Welbourn v. Kleinle,* 92 Md. 114, 123, 124, 48 A. 81; *Hagerstown Mfg. Co. v. Keedy,* 91 Md. 430, 436, 46 A. 965. The principle adopted by our predecessors has merits which should prevent any departure, since it serves, not only to check the cupidity of corporate fiduciaries and to remove the difficulty of obtaining evidence of wrongful conduct by declaring presumptively

fraudulent the questioned transactions, but also to assure protection and permanency to just corporate transactions by making this presumption rebuttable, upon the production by the 'fiduciaries of proof which clearly establishes that the transactions are fair, honest, and equitable.

The more drastic doctrine enforced in other jurisdictions has, apparently, not been more effective than that of this tribunal in the prevention of breaches of duty by the fiduciaries of corporations; and is furthermore open to the practical objection that its tendency is to deprive the corporation of the aid, in its financial affairs, of those best advised of the necessity for the aid and most interested in giving it, with judgment, according to the exigencies of the situation.

Before proceeding with the application of the general principle in force in this jurisdiction, the actual relation of the parties to the questioned mortgages must be known; and, in the ascertainment of that fact, recourse must be had to that other equitable rule, that the form of a corporate entity may be disregarded when the ownership of all of its corporate stock is in one person, and, because of the circumstances, it becomes necessary to disregard the formal corporate existence to prevent fraud or imposition or to enforce a paramount and superior equity. *Carozza v. Federal Finance Co.,* 149 Md. 223, 228, 131 A. 332, and cases and authorities there cited. *Dollar Dry Cleaners & Dyers v. MacGregor,* 163 Md. 105, 161 A. 159, 161.

At the time of the execution of the several documents mentioned on this record, the corporate stock of fifty shares of the Milburn Realty Company, the mortgagor, was all owned by three stockholders, who were its board of directors and its executive officers. Isaac Rosenberg was the president and owned seventeen shares of stock, Harry M. Berman was the secretary and treasurer, and his father, Joseph Berman, was the third director, and each of the two last-named stockholders owned sixteen and one-half shares of the stock. The corporation was engaged in the purchase and development of real estate and in construction work. For this purpose it required large sums of money, which it generally obtained,

from time to time, from the Lyon Realty Company, which owned and operated an apartment house. The stock of the last-named corporation was, with the exception of two shares, owned by Joseph Berman. Harry M. Berman, a son, and Isaac Rosenberg, a son-in-law, held these two shares for the purpose of qualifying them as directors, and their certificates carried an assignment to Joseph Berman, who was, substantially, the sole stockholder. While the two corporations had the same three thus related persons as stockholders and directors, the corporations were engaged in different corporate enterprises, which were separately controlled and operated.

In order to make provision for the funds which might become necessary to carry on its business, the Milburn Realty Company, on January 6th, 1923, entered into a contract with Joseph Berman, the Lyon Realty Company, and the Druid Realty Company, whereby these parties agreed to furnish the Milburn Realty Company such sums of money and at such times as Joseph Berman would deem necessary for the carrying on of its business. In consideration of these loans, the borrower agreed to secure any such lender by mortgage lien, when demanded, on such of the borrower's property as Joseph Berman should believe adequate. As a result of this contract, money was borrowed and the balances due on the current accounts would vary according to circumstances, but, finally, the borrower became indebted to both the Lyon Realty Company and the Druid Realty Company, which was, likewise, for all practical purposes, owned by Joseph Berman, with the same officers and directors as the Lyon Realty Company. The indebtedness to the Druid Realty Company was comparatively small, but that to the Lyon Realty Company was large, and the latter company acquired the smaller demand and consolidated both loans. Pursuant to the terms of the contract under which these loans had been made, a mortgage deed of all its property was demanded and given to the Lyon Realty Company on July 29th, 1930, for $124,-564.38. This mortgage was, without delay, duly recorded, and the Lyon Realty Company continued in the usual and

472

active course of its business. About the first of the following year, the Milburn Realty Company desired to erect a row of houses on a part of the mortgaged premises, and had the Lyon Realty Company release a portion of the mortgaged land in order to obtain a mortgage loan on it from a third party, and, after having successfully concluded this transaction, gave, on February 20th, 1931, to the Lyon Realty Company a second mortgage on the land so released for $35,000. The houses were built and the corporation continued to function until July 18th, 1931, paying out large sums of money in discharge of its ordinary and current obligations.

The term insolvency is defined by the decisions of this tribunal, but the difficulty is, generally, in determining if the facts of the instant case fulfill the applicable definition, as is illustrated in the different conclusions drawn from the record at bar. When all the testimony is considered as a whole, and its divergent portions weighed in connection with the character and credibility of witnesses and the import of persuasive circumstances, the writer is of the opinion that the explanation given by the witnesses of some testimony of an inability to meet liabilities when due in the ordinary course of business and of the content of a letter of November 7th, 1930, which admitted a present inability to pay two obligations of the corporation in the ordinary course of its business, is correct; and that, while the Milburn Realty Company did not pay taxes for two years on one of its properties, and did not meet the interest payment accruing due, with the principal of the mortgage debt of $37,079, on October 8th, 1930, the reasons for these two solitary defaults were that the receipts of money by the corporation had been affected by the failure to maintain its sales, and that it was unable to obtain either an extension or a renewal of this mortgage because of a general decline in the demand for building lots, which constituted the chief assets of the corporation but which had not, in November, 1930, then approximated their later ultimate and disastrous shrinkage in market value; and that, although the corporation was unques-

tionably embarrassed in the conduct of its business by general market conditions, the testimony does not establish that the directors of the corporation knew or had reasonable cause to believe that the borrower had insufficient assets to discharge in full all of its existing liabilities on the dates of the execution, in the course of its business, of the two mortgages in controversy. A different conclusion has been stated, and is firmly held, by other members of the court, but this circumstance does not afford any justification for an effort to vindicate the writer's position by a review of the testimony, and no more than his findings on the facts will be given.

The corporation was, on July 29th, 1930, a going concern and expected to continue. It did not contemplate insolvency. Moreover, its financial condition then imposed upon it no duty to cease doing business. Subsequent developments which reduced the corporation to insolvency cannot be given decisive weight in determining whether or not a state of known insolvency existed at a prior date. The two mortgages were unquestionably made with the intent to prefer the mortgagee, but an intent to prefer is not the same as an intent to defraud. As has been recently said, "preferences are not fraudulent, and, aside from a statute of insolvency or bankruptcy, an innocent creditor who can secure enough to satisfy his claim is entitled to hold it against other creditors, although the debtor is insolvent." *Drury v. State Capital Bank,* 163 Md. 84, 161 A. 176, 178, 179, decided June 20th, 1932; Code, art. 39B, secs. 3(a) and 4; *Van Iderstone v. National Discount Co.,* 227 U. S. 575, 582, 33 S. Ct. 343, 57 L. Ed. 652, 654; *Coder v. Arts,* 213 U. S. 223, 29 S. Ct. 436, 53 L. Ed. 772. So, the question of insolvency *vel non* becomes merely an evidential fact in the determination of whether or not the giving of the mortgages was a fraud.

There is not any denial of the necessity and good faith of the contract in writing of January 26th, 1923, whereby the Milburn Realty Company provided for its future financial requirements by agreeing to secure the Lyon Realty Company and the other named lenders, for the loans to be so made, by the execution of a mortgage lien on all or such of

its corporate property as might be requested by Joseph Berman. Nor is there any controversy that the mortgages in question were executed in the performance of this contract, and that the mortgage indebtedness was honestly incurred and used for corporate purposes, and, although a prior obligation, constituted a valuable and a full consideration in the amount specified, and is due and unpaid. In all these transactions there was no concealment, no unfairness, no improvidence, and no fraud. It is true that the borrower and the lender had the same directors, and that Joseph Berman was, in reality, the sole owner of the stock of the corporate lender, and the one-third owner of the stock of the borrower, but these common directors of the lender and the borrower were the executive officers and the owners of all the respective corporate stock of both corporations, and, therefore, the contract and mortgages had the approval of all the officers and stockholders of both corporations, and, so, the corporations are bound. *Leavenworth County v. Chicago, etc., Railway Co.,* 134 U. S. 688, 10 S. Ct. 708, 33 L. Ed. 1064; *Nye v. Storer,* 168 Mass. 53, 46 N. E. 402; *U. S. Steel Corp. v. Hodge,* 64 N. J. Eq. 807, 54 A. 1. Nor can any class of creditors complain.

The law is well settled that a promise in writing to execute a mortgage of particular property, or a defectively executed or unrecorded mortgage, creates an equitable lien upon the property, which is enforceable by a court of equity not only against the promisor, but also against parties who claim under him as volunteers or without an equity superior to that of the creditor, so that the claim of the equitable lienor is entitled to priority over unsecured creditors existing at the time of the making of the promise, but not to priority over general creditors whose debts were contracted after the date of said agreement and without notice. *Textor v. Orr,* 86 Md. 392, 399, 38 A. 939; *Applegarth v. Wagner,* 86 Md. 468, 473, 38 A. 940; *Pannell v. Farmers' Bank,* 7 H. & J. 202; *Sixth Ward Building Assn. v. Willson,* 41 Md. 506; *Stanhope v. Dodge,* 52 Md. 483; *Hoffman & Flack v. Gosnell,* 75 Md. 590, 24 A. 28; *Brown v. Deford & Co.,* 83 Md.

297, 34 A. 788; *Cissell v. Henderson*, 88 Md. 574, 41 A. 1068; *Dyson v. Simmons*, 48 Md. 218; *Alexander v. Ghiselin*, 5 Gill, 138; *Diggs v. Fidelity & Dep. Co.*, 112 Md. 50, 72, 75 A. 517; *Brady v. Johnson*, 75 Md. 445, 451, 455, 26 A. 49; *Butler v. Rahm*, 46 Md. 541, 548.

It follows that the original contract in writing has a dual office on this record. In the first place, it established a superior equity in the lender corporation as against the subsisting general creditors of the borrower at the date of its execution, and an equal equity as against all unsecured subsequent creditors; and, in the second place, it demonstrated that the mortgages in controversy were the performance of a subsisting contractual obligation between the borrower and the lender, and thereby convincingly proved the good faith, reasonableness, and fairness of the transaction, with reference to the existing creditors of the corporation, since the amount of the mortgage debt is not questioned, and, although all the corporate property was conveyed, the security was not disproportionate to the indebtedness of between $124,000 and $125,000, because of the value of the property and of its incumbrance of prior mortgage liens. *Glenn v. Grover*, 3 Md. 226, 227; 15 *Halsbury's Laws of England*, sec. 172, pp. 83, 84. It may be observed in this connection that, when these mortgages were foreclosed on July 18th, 1931, the aggregate of the two sales was the gross sum of $5,705.

The mortgage deed of July 29th, 1930, with its affiliated and subordinate mortgage deed of February 20th, 1931, was openly made for value, without fraud, even if intended to prefer, and promptly recorded. They were executed primarily to secure a creditor in fulfillment of the terms of a valid contract, under which the corporation had obtained the full amount of the mortgage debt for its corporate uses. *Johnson v. Stockham*, 89 Md. 367, 43 A. 920. It cannot be said that the performance of this valid antecedent contractual obligation, upon which the creditor had, from its date in 1923, relied in furnishing the money which constituted the mortgage debt, was a breach of any legal or equitable duty of the mortgagor to its subsisting creditors. See *Jones on Mort-*

*gages* (8th Ed.), sec. 226, p. 265; *Collier on Bankruptcy* (13th Ed.), p. 1253; *Davis v. Billings,* 254 Pa. 574, 99 A. 163; *Sanford Fork & Tool Co. v. Howe, Brown Co.,* 157 U. S. 312, 319, 15 S. Ct. 621, 39 L. Ed. 713; *Huntley v. Kingman & Co.,* 152 U. S. 527, 532, 14 S. Ct. 688, 38 L. Ed. 540; *Sexton v. Kessler,* 225 U. S. 90, 96, 97, 99, 32 S. Ct. 657, 56 L. Ed. 995. So, the execution of these mortgages, under the circumstances of the record, was neither an actual fraud upon creditors nor acts done with the intent improperly to delay or hinder creditors within the meaning of the Statute of 13 Elizabeth, ch. 5, as codified in article 39B of Code, *supra. Bump on Fraudulent Conveyances,* pp. 19-26; *Mowen v. Nitsch,* 103 Md. 687, 688, 62 A. 582; *Castleberg v. Wheeler,* 68 Md. 275, 276, 12 A. 3; *Wilson v. Russell,* 13 Md. 494, 528-536; *Dyson v. Simmons,* 48 Md. 214-218; *Commonwealth Bank v. Kearns,* 100 Md. 208, 209, 59 A. 1010; *Wareheim v. Bayliss,* 149 Md. 107, 108, 131 A. 27; *Kerr on Fraud* (6th Ed.), 220, 221, 273, 274, 281-284.

The two mortgages were, therefore, both upon a valuable and adequate consideration, and are shown to have been executed in good faith and free of all fraud, and, therefore, they must prevail and have effect as against all subsequent lien creditors and all general creditors without reference to the times when their claims arose, because the period within which they could be attacked as creating an unlawful preference was suffered to pass. *Supra;* and see Code, art 66, sec, 11; *Sullens v. Finney,* 123 Md. 653, 657, 658, 91 A. 700; *Felgner v. Slingluff,* 109 Md. 474, 480, 71 A. 978; *Annan v. Hays,* 85 Md. 505, 508, 509, 37 A. 20.

DIGGES, J., dissents from the decision of the Court.