# COMMONWEALTH BANK OF BALTIMORE  C IT Y *vs.* VINCENT M. KEARNS, ADMR.

### *Fraudulent Conveyances—Burden of Proof.*

A man conveyed certain pieces of leasehold property to his son upon the expressed consideration of six thousand dollars.    A creditor of the grantor who held a mortgage upon other property, which proved upon the sale to be sufficient to pay the mortgage debt, filed the bill in this case to vacate the conveyance to the son alleging it to be fraudulent.

*Held*, that the testimony of the grantee that he had loaned the sum named to his father is corroborated by his accounts with a Savings Bank and a Building Association is not contradicted; that the consideration expressed in the deed was a fair price for the property conveyed, and since there is no evidence to show that the deed was not made and accepted in good faith the plaintiff is not entitled to the relief asked for.

When the circumstances surrounding a transfer of property are not such as of themselves to lead to the inference that it was not made in good faith, the burden is on a creditor who attacks the conveyance to show that it was not made upon an adequate consideration or that the parties designed to delay or defraud the creditors of the grantor.

The fact that a grantor is financially embarrassed does not render voidable a deed made by him *bona fide* and for value to one creditor.

Appeal from the Circuit Court No. 2, of Baltimore City (SHARP, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Robert Biggs*, for the appellant.

*Wm. S. Bansemer* and *Clifton S. Brown*, for the appellee.

BOYD, J., delivered the opinion of the Court.

The appellant filed a bill in equity against Samuel Rosenblatt and William Rosenblatt to set aside a deed made by Samuel to William, dated the 6th of June, 1896. It alleges that whilst the deed purported to have been made for the consideration of six thousand dollars, as a matter of fact no consideration was paid and the deed was made by Samuel and accepted by William with the design to hinder, delay and defraud the plaintiff and to prevent it from collecting the debt due it; that Samuel continued in possession of the property, collecting the rents, paying the taxes, ground rents and other expenses, and he was in every way and to all appearances the owner of the property as fully, completely and beneficially as before the deed was made. It further charges that on the 20th of February, 1894, the National Howard Bank loaned Samuel thirty-five hundred dollars, and as security for it took a mortgage on certain fee-simple and leasehold property; that at the time of making said loan Samuel was the owner of a large and valuable estate in addition to the property covered by the mortgage, and on March 1st, 1895, the plaintiff, at the request of Samuel, and relying upon his ownership of the other property,

as well as that included in the mortgage, purchased the mortgage from the National Howard Bank; that Samuel has allowed the property included in the mortgage to become dilapidated and it is wholly inadequate and insufficient to pay the debt due the plaintiff.    The bill prays that the deed from Samuel to William be set aside and declared null and void; that the property be sold for the satisfaction of the debt due the plaintiff, and for general relief.

The two defendants answered, denying all fraud and most of the other material allegations of the bill.    Subsequently Samuel died and his administrator was made a party.    Testimony was taken and upon hearing of the case the Court below passed a decree dismissing the bill.    From that decree this appeal was taken.

The consideration in the deed is stated to be six thousand dollars.    Ten properties were conveyed by it, each of them being subject to a ground rent, but one of them subject to a rent of only "one cent, if demanded"—the others ranging from fifteen to two hundred dollars per annum.    The plaintiff called as its witness William Rosenblatt and examined him very thoroughly.    The substance of his testimony is that Samuel Rosenblatt, who was his father, owed him a large amount of money and had for years promised to convey him property in payment of it.    We do not understand the meaning of his testimony to be, as appellant contends, that he brought from North Carolina, where he had been employed, twenty-five or twenty-six hundred dollars, which he loaned his father, together with eighteen hundred dollars which he had deposited in the Savings Bank of Baltimore.    In answer to the second question after the one which the appellant so interprets, he said he brought from North Carolina about eleven hundred dollars, and later on he said he had loaned his father from the Savings Bank eighteen hundred dollars.    He admitted he could not tell exactly when he made the payments to his father, but in his account with the Savings Bank of Baltimore it was shown that he had drawn out $200 August 6th, 1877, $800 October 20th, 1879, $500, December 7th, 1880, and $300

March 6th, 1882, all of which he says he drew out to lend his
father.   His account with the Eutaw Savings Bank shows a
number of payments to him, which he says were also for his
father.   His pass-book with the Orleans Per Bldg. Associa-
tion shows that he had drawn out money at different times,
and he testified that $447 of that was for his father.   He made
a statement of sums loaned to his father at different times from
1876 to June 1896, which amounted to $10,300.  It is true he
did not take his father's notes or other evidences of indebted-
ness, and he did not have any book in which the loans were
entered, but he explains the absence of the latter by saying
the book in which he had some of the entries was stolen from
him in 1894.   It must be admitted that the transactions were
not conducted in a very business-like way, but the dealings
were between father and son and they do not always transact
business in a way strangers would likely do.   But the potent
fact remains that by the accounts with the Savings Banks and
the Building Association he does, to a great extent, corrobo-
rate his statements.   In the absence of notes and book ac-
counts he has given as satisfactory explanations of the trans-
actions as could be expected.   It is true that there may be
some suspicious circumstances, but after his father's death no
one but himself could explain the transactions, and we feel
that his answers were for the most part as fair and full as could
be expected, and we are satisfied that the evidence shows there
was at the time the deed was made to him an indebtedness
due by his father of a large sum of money, certainly as much,
if not more, than that named as the consideration of the deed.

It is not very clearly shown what the value of the property
conveyed by the deed was in June, 1896.   The solicitor for
the appellant contends that the appellee, Rosenblatt, fixed it
at fourteen thousand dollars, but we do not so understand
his testimony. He admitted that he had named fourteen thou-
sand dollars as the price to an Orphan Asylum for some of
the properties mentioned, but that included property of his
sisters, Mrs. New, and Mrs. Adler, and he said he would en-
tertain an offer of ten thousand dollars.   There were mort-

gages on the properties when he bought them—thirty-five
hundred and ninety dollars being due to one Building Asso-
ciation, and sixteen hundred and forty dollars to another at
that time.    According to his testimony there was certainly as
much as six thousand dollars due him; he paid other debts
of his father, supported him for the rest of his life and took
the properties subject to mortgages for five thousand two
hundred and thirty dollars.    He therefore paid at least
$11,230, subject to the ground-rents.    We find nothing in
the testimony tending to show that this was not a fair price
for the property conveyed to him.

Comment was made on the fact that William, after stating
the consideration to be the money that he had loaned his
father, added that he was to support him for life, to pay his
debts for merchandise, and then assigned an additional reason
for the conveyance that he, William, was the only child of
Samuel who had helped to support his father and hence the
deed was made to him to prevent the property from going to
all the children.    While it is true that he did afterwards give
other reasons for the execution of the deed (some of which
could not be treated under the law as part of the considera-
tion, as they were of a kind different from that named in the
deed), his first explanation about the money he had loaned
his father was in response to questions which naturally
brought answers which were concerning that.    They com-
menced by telling him to "state how the purchase-money
mentioned in said deed was paid," and that was followed up
by questioning him how he earned the money, how he kept
it, etc., and hence there cannot fairly be any presumption
against him because he did not then refer to the other matters.

The deed was made and recorded about six years before
the bill was filed, and if it be true, as contended by the appel-
lant, that the properties included in the mortgage were al-
lowed to get into a dilapidated condition, the probabilities are
that they were in better condition, and hence would have
brought better prices, in 1896 when the deed was made than
when they were sold, which was after the bill was filed in

1902.   The plaintiff not only had constructive notice of the transfer by the record of the deed, but its president, who was also president of a building association, released in the latter capacity a mortgage given by Samuel on some of this property, and the Association took another mortgage from William, who afterwards paid the dues to the Association.   Although the president testified that he did not know William, it is manifest that the transaction ought to have suggested to him the fact that the title was then in William, and if the bank was looking to this property for the payment of its debt, or any portion of it, ordinary business prudence would have suggested the propriety of examining the records.   The transaction at least shows that William was not attempting to conceal his ownership of the property.   It is difficult to understand why the appellant relied on property other than that contained in the mortgage as an inducement to make the loan, for if it had any doubt about the sufficiency of the property included and it was taking the mortgage at Samuel's request, as it contends, the simple way to protect itself would have been to have demanded that more property be included and a new mortgage given.   It is much more probable that the parties deemed what was included sufficient.   William swore that when the deed was made to him his father and himself thought it was, and there is nothing to contradict that statement.   Of course all property of Samuel was in a sense liable for this debt to the bank, as well as his other debts, but that did not prevent his making a *bona fide* sale of any portion of it, subject to existing liens, and there was no reason why he could not convey it to other creditors in payment of their debts, provided it was done for proper consideration and not with intent to delay, hinder or defraud his other creditors, or any of them.

There is no doubt that when there is nothing on the face of a deed indicating fraud, or some illegal or improper intent condemned by the law, the burden is on those attacking it to show either that it was not made upon a good consideration, or that it was made with a fraudulent intent upon the part of

the grantor to hinder, delay or defraud his creditors, and that this intent was known to, or participated in, by the grantee. *Fuller* v. *Brewster & Co.*, 53 Md. 359; *Totten* v. *Brady*, 54 Md. 171. When, however, the circumstances surrounding the transfer of property to the detriment of creditors are such as to lead to the inference that there has been a fraudulent intent, the *onus* of disproving fraud rests on the parties maintaining the validity of the transaction. *Zimmer* v. *Miller*, 64 Md. 296. And we might add that when they are between those closely related, such as father and son, Courts should always examine very critically into transactions that secure, in whole or in part, the alleged indebtedness of one to the other to the exclusion of other creditors. But while that is true, independent of some statutory regulation, such as bankruptcy or insolvency proceedings, the law does not prohibit near relatives from giving preference to each other when done *bona fide*, without fraudulent intent, and upon proper consideration. The fact that the grantor was embarrassed and in failing circumstances would not render void a deed made by him to one creditor, provided it was a *bona fide* transaction, *Totten* v. *Brady*, *supra*, and in this case, as we have seen, the evidence does not even show that the grantee knew or thought the grantor could not pay his creditors in full. The fact that the deed recites as the consideration "the sum of six thousand dollars, the receipt whereof is hereby acknowledged," does not in any way invalidate it, if it be true that it was for that much, or more, indebtedness, *Totten* v. *Brady*, *supra*. In *Fuller* v. *Brewster & Co.*, *supra*, the consideration mentioned in the deed was a mortgage for $1,240 and a judgment of $3,916 due the grantee by the grantor, and the testimony showed that the mortgage debt was included in the judgment, but that was held not to be sufficient to justify the Court in setting aside the transfer, and in speaking of what disparity between the real value of the property and the consideration mentioned in the deed should constitute an inadequacy of price, the Court said "This ·must depend upon the facts and circumstances of each particular case. We may safely say, however, that to justify the

inference of fraud, the disparity must be so glaring as to satisfy the Court that the conveyance was not made in good faith."

So many cases concerning conveyances alleged to have been fraudulent have been before this Court from time to time that it is impossible to review them without making an opinion unnecessarily long but those we have cited are sufficient to show how many of the questions involved in this appeal have been determined. It is only necessary to add that the appellant has in our opinion failed to establish the material allegations of the bill. It has not only not shown that no consideration was in fact paid, but proved by one of the defendants, called by it as a witness, that there was *ample* consideration, unless we refuse to believe him, when there is no sufficient evidence to contradict him. It has likewise failed to establish the charge that the deed was made and accepted with a design to hinder, delay and defraud the appellant and to prevent it from collecting its debt. It has utterly failed to prove that Samuel continued in possession of the property, that he collected the rents, or did other acts of ownership over the property. The allegations that Samuel, contriving still further to injure and defraud the plaintiff, had collected the rents and income from the properties conveyed by him in the mortgage, but allowed the improvements on the properties to become dilapidated and ruinous, and now declines to make any effort to pay the plaintiff, declaring that it may have said properties and will get nothing more, could not, if conceded to be true, in any way affect William without showing some connection by him with such conduct. As he had owned the property involved in this case for nearly six years before the bill was filed, it would be difficult to connect him with those acts on the part of his father, for, as we have already intimated, it may be that the condition of the property complained of may be the result of neglect of it and inattention to it during the six years prior to the filing of the bill, as property of this character would deteriorate very rapidly if not repaired and kept up for that time. So without discussing the question of laches on the part of the appellant, by reason of it not proceeding for nearly six years

after the deed was recorded, especially as Samuel Rosenblatt was 78 years of age at that time and died at the advanced age of 84, before any testimony was taken, we are of opinion that the Court below was right in dismissing the bill and will affirm the decree.

> *Decree affirmed, the appellant to pay the costs.*

(Decided January 13th, 1905.)