## KLINE ET AL. *v.* INLAND RUBBER CORPORATION

[No. 44, October Term, 1949.]

124

*Decided December 9, 1949.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Edward J. Ryan* and *William L. Wilson, Jr.*, for the appellants.

*Walter C. Capper* and *Horace P. Whitworth, Jr.*, with whom were *Thomas B. Finan, William S. Jenkins*, and *Capper & Jenkins* on the brief, for the appellee.

MARKELL, J., delivered the opinion of the Court.

In 1945 Lewis Yankelevitz and S. Martin Kornblatt formed a partnership under the name United Distributors and engaged in an automobile accessory business in Cumberland. From January, 1948 till August, 1948 they bought from plaintiff, Inland Rubber Corporation, of Chicago, tires and other accessories at an aggregate cost of about $30,000. On August 12, 1948 there was due by United to plaintiff $9,937.85. On September 4, 1948 plaintiff brought suit, and on October 20, 1948 obtained judgment by default for $9,937.85 with interest and costs.

On January 26, 1948 Yankelevitz sent Dun and Bradstreet an auditor's financial statement of United, as at December 31, 1947. Before making sales to United plaintiff, like other creditors, got the statement from Dun and Bradstreet. It showed "net worth" of $34,521.-

84, among assets "land and building", $23,000, and no liabilities except accounts and notes payable ($6,898.64) and "fixed liability: mortgage payable, $9,787.88." The land and building referred to was the property 136-138 North Mechanic Street, where United did business. The property was bought in October, 1945 for $12,000; it was not conveyed to United or to the partners, but to Norman Kline, who gave a purchase money mortgage for $12,000 to the Commercial Savings Bank. Lewis Yankelevitz and Norman Kline are cousins. Lewis's father, Samuel Yankelevitz, and Norman's father, Morris Kline, are brothers-in-law. Lewis says the Commercial Savings Bank offered to loan them $12,000 on mortgage if they put the property in Norman's name. Evidently Norman had some credit, enough in addition to the security of the property to induce the bank to loan 100 per cent on mortgage. By December 31, 1947 United had paid the mortgage debt down to $9,787.88.

A mortgage of the same property from Norman Kline and wife to Morris Kline, dated August 21, 1948 and recorded the same day, recites that Norman and wife "are now indebted" to Morris "in the full and just sum of $7,000.00, for which they have given their promissory note of even date herewith payable on or before five years after date with interest at the rate of 4½ per cent per annum, payable semiannually, with the privilege of paying on the principal at any interest paying period," and is made "in consideration of the premises, and of the sum of $1 in hand paid, and in order to secure the prompt payment of the said indebtedness at the maturity thereof," with interest, "with the expressed understanding that the property covered is the sole security and obligation for said loan of $7,000.00 and in the event said indebtedness is not paid as agreed," Morris, his heirs and assigns "shall only have recourse against said property and not against" Norman and wife for any deficiency. The same understanding was expressed in the note. The mortgage bore an affidavit by Morris Kline "that the consideration in said mortgage is true and *bona fide* as set

forth." At the time of the mortgage Norman did not owe Morris anything at all. In a letter, dated August 20, 1948, to Norman from Lewis and his wife and Kornblatt and his wife, Norman and his wife were authorized and requested to execute a mortgage to Morris for $7,000, representing "money advanced to us by the said Morris Kline and Samuel Yankelevitz, about $3,500.00, to be assigned to him in due course by the said Morris Kline."

Norman says, "the money from this mortgage, this $7,000.00," was "borrowed" "to pay for the property"; "the money which was obtained upon this second mortgage" "was to pay my father and Mr. [Samuel] Yankelevitz off;" "my father endorsed a note for Lewis Yankelevitz" "in the Commercial Savings Bank for $4,500.00, and Lewis Yankelevitz or United Distributors paid off a certain amount of money and I believe the balance was around $3,500.00;" his father "had to pay the $3,500.00 at the Commercial Savings Bank"; "in fact Pop is paying it right now;" "and then Sam Yankelevitz accepted the mortgage from Pop; Pop was more or less a trustee for the balance of the money." Lewis Yankelevitz, when asked "what the $7,000.00 was used for", says, "Back two years ago, I had borrowed $3,500.00 from my father through the Second National Bank which was used in the business to pay off some accounts of the business at that time." "My father went my security at the Second National Bank on a note for six months; later the United Distributors owed the Peoples Bank $4,500.00." The Peoples Bank "demanded payment of the $4,500.00 and Morris Kline signed a note at the Commercial Bank for $3,500.00, which I was paying on at the time that the second mortgage was issued, I owed Morris Kline and my father approximately $7,000.00;" and "that $7,000.00" "paid off the two notes at the Commercial Bank and the one at the Peoples Bank," "representing money paid at each bank." Morris Kline, when asked what "that $7,000.00 mortgage was given him for", says "$7,000.00 was given to me and the balance at the [Commercial] bank was $3,375.00";

"$3,375.00 to the Commercial Bank unpaid by Lewis Yankelevitz on the money that I lent him, $4,000.00;" "the bank come to me and I paid [that $3,375.00] off;" "the balance was to take care of Lewis Yankelevitz's father, $3,500.00", "which he paid off at the Second National Bank;" when he [Morris] is paid the money he will give "part of it to Samuel Yankelevitz and part to me", the part to himself "represents the $3,500.00", paid "for the money that I lent him when—he got it at the Commercial Bank"; the part to Samuel Yankelevitz "is money that he gave" at the Second National Bank. Samuel Yankelevitz says he knew of this $7,000 mortgage; "I give him $3,500.00 at the Second National Bank to my son"; "and after, you know when I told Morris Kline, I took it in trust for him, to protect his mortgage," "and left it and I hope to get my money;" "that was the money that [he] paid off to the Second National Bank, money which went to Lewis Yankelevitz", and he has never been paid back yet. The testimony above quoted or mentioned, of the two Klines and the two Yankelevitzes, confused and in some details contradictory, consists in large part of leading questions by counsel for appellants and the answers. This testimony was taken March 26, 1949.

A demand note, dated August 21, 1947, for $4,500, with interest, payable to the order of Morris Kline, at the Commercial Savings Bank, was signed by Lewis Yankelevitz. The cashier of the bank testifies that on August 21, 1947 Morris Kline executed a mortgage of property of his own to the bank for $4,500; the bank gave Kline a cashier's check for $4,500, which was endorsed by Kline, and also by Lewis Yankelevitz to the Peoples Bank, was paid by the Peoples Bank on August 22, 1947 and by the Commercial Savings Bank the next day; he "definitely knows that this loan was made for the use of Lewis Yankelevitz;" Yankelevitz made payments on it, the last on August 14, 1948; the balance at that time was $3,375. The cashier of the Second National Bank testifies that on April 21, 1947 the bank

loaned to Lewis Yankelevitz "on a note, endorsed by his father and his father's checking account pledge for that same amount, $3,500.00." "On August 23, 1948 there was $3,000.00 paid on that mortgage by Sam Yankelevitz; it was charged to his account."

Lewis Yankelevitz says that before the second mortgage was executed for the $7,000 he "contacted [plaintiff] on two different occasions" in April, 1948, and at that time offered them the second mortgage notes, which they refused to take at that time, and in the early part of August, 1948, he "was in Chicago again and they wanted the second mortgage notes at that time, but they wouldn't give me the same deal, what they would do about the account if I would give it to them, and I wouldn't give them the second mortgage note".

On October 22, 1948 execution was issued on plaintiff's judgment and was levied on all United's assets in their place of business to which they had recently moved. The proceeds of a sheriff's sale were insufficient to pay a $300 rent claim. On January 14, 1949 plaintiff filed a petition for "supplementary proceedings" under art. 75, secs. 147-152, of the Code, and obtained a preliminary injunction restraining defendants, Lewis Yankelevitz and Kornblatt, and also Norman Kline and the Commercial Savings Bank, from disposing of or encumbering the Mechanic Street property pending the proceedings. On February 5, 1949 these proceedings were heard and plaintiff examined defendants, Lewis Yankelevitz and Kornblatt, and also Norman Kline and the cashier of the bank. Strange to say, plaintiff had not yet "discovered" the second mortgage which had been recorded on August 21, 1948. In a vain effort to bring to light hidden assets, defendants were questioned at length about the acquisition and ownership of the land and building and about their statement given Dun and Bradstreet in January, 1948. They were not questioned about any second mortgage and, with entire lack of candor, were careful not to disclose this mortgage or the debt secured thereby. At the close of the testimony, the court said: "The court

finds that the property belongs to Yankelevitz and Korn-blatt and did so at the time of the deed and the execution of the [first] mortgage, and will order Mr. Kline and wife to convey it to them." No opinion or order was filed.

On March 11, 1949 plaintiff filed a supplemental petition, alleging that since the hearing it had "discovered" the mortgage, that the property was held by Norman Kline for the purpose of fraudulently defeating the rights of the creditors of Yankelevitz and Kornblatt and that the mortgage was executed and delivered for the further purpose of defeating the creditors of Yank-elevitz and Kornblatt, and praying that Norman Kline and his wife and Morris Kline show cause why they should not be ordered to release the mortgage. The same day plaintiff obtained a preliminary injunction restraining the Klines from disposing of or encumbering or changing the mortgage pending the proceedings. On March 22, 1949 the Klines answered, vaguely and not even grammatically, "that prior to the time that. the second mortgage which is now held by Morris Kline, father of Norman Kline, [sic?] the Inland Rubber Corporation was given the privilege of taking over said second mortgage and were fully informed of everything that was done in the premises, but refused to pay the obligations against said property which were necessary and for which said second mortgage was given, which is not [now] held by Morris Kline * * *". and denied "that the mortgage mentioned in the petition filed on March 11th, was for the purpose of fraudulently defeating the rights of the creditors of Yankelevitz and Korn-blatt, but that said mortgage was a legitimate transaction executed for the purpose of securing money which had been advanced to the said Lewis Yankelevitz, which money had been used by the said Yankelevitz and Martin Kornblatt for the payment of bills incurred by them in their business operations."

On March 26, 1949 the supplemental petition was heard and the testimony and other evidence above quoted

or mentioned was taken. On April 7, 1949 the court filed an opinion in which it said that at the second hearing there was "uncontradicted evidence showing that there was no consideration for the said mortgage and that the affidavit as to the consideration for the said mortgage was false", and that it had come to the conclusion that the deed and the mortgage were made for the purpose of placing the property beyond the reach of the creditors of Yankelevitz and Kornblatt. On the same day a decree *nisi* was filed, and on April 26, 1949 was reaffirmed and made absolute, adjudging that the mortgage was "void and of no effect" and ordering Morris Kline to release it and Norman Kline to convey the property to Lewis Yankelevitz and Kornblatt.

Morris Kline and Norman Kline have appealed. As has been stated, Samuel Yankelevitz testified on March 26th but was not formally made a party and has not appealed.

Appellants (*i.e.*, Morris Kline, as Norman claims no real interest in the property) contend that the conveyance to Norman and the mortgage from him to Morris were not made with intent to hinder, delay or defraud creditors of the partnership (Art. 39B, secs. 7, 8) ; that the alleged antecedent debts of Lewis to his father and to Morris constituted fair consideration for the mortgage (Art. 39B, sec. 3) ; that the affidavit as to the consideration was not false, and the mortgage was not invalidated by any honest mistake in stating the consideration.

Appellants cite *In re Shapiro* DC, Md. 35 F. Supp. 579, in which Judge Chestnut, and on appeal (*Sandler v. Freeney*, 4 Cir., 120 F. 2d 881), Judge Soper, reviewed decisions of this court to the effect that a mortgage is not invalidated where the affidavit is in good faith but mistakenly made. In that case a mortgage was held valid, in which the consideration was said to be the purchase price of the property but actually was the cost of the property, *i.e.*, the price plus certain expenses. It is unnecessary to consider the exact scope of that case or

of the conclusions there drawn from the decisions of this court. The instant case is not within the decision- or the opinions in that case but is, we think, governed by *Groh v. Cohen,* 158 Md. 638, 149 A. 459. In *Groh v. Cohen,* a purchaser, to insure priority of two purchase money mortgages over judgments outstanding against him, caused on the same day (1) title to be conveyed to an employee, (2) two purchase money mortgages to be executed by the employee and his wife and (3) the equity to be conveyed by the employee and his wife to the purchaser by a deed in which the purchaser assumed the mortgage debts. It was an undisputed fact, understood by the mortgagees, that the mortgagors actually incurred no part of the indebtedness recited in the mortgages for the purchase and improvement of the property. The mortgagees made affidavits that the considerations stated in the mortgages were true and *bona fide* as therein set forth. The court said, "The statement thus made in the affidavits being fictitious, it is just as ineffective as if it had been omitted. * * * The considerations stated in the mortgages in question purported to be loans to the * * * mortgagors, when in truth no such loans were ever made or contemplated. * * * But such a purpose [of protecting the mortgagees from the liens of the pre-existing judgments] does not justify or validate the use of affidavits which are illusory."

The court then said: "In the case of *Ressmeyer v. Norwood,* 117 Md. 320, 83 A. 347, the contested mortgage recited as its consideration an indebtedness of $6,657 from the mortgagor to his wife, the mortgagee, while it was proved that the mortgage was not executed to secure an indebtedness to the mortgagee, but for the purpose of being assigned as security for debts owing by the mortgagor to other persons for a total amount equal to that which the mortgage specified. It was held that, apart from any question of actual fraud, the mortgage was void as against the liens of attachments levied on the mortgaged land, because the consideration in the mortgage was not true and *bona fide* as therein set forth,

although so characterized in the accompanying affidavit. In support of that conclusion the court cited the cases of *Denton v. Griffith,* 17 Md. 301; *Cockey v. Milne,* 16 Md. 200; *Nelson v. Hagerstown Bank,* 27 Md. 51; *Marlow v. McCubbin,* 40 Md. 132.

"In *Govane Building Co. v. Sun Mortgage Co.,* 156 Md. 401, 144 A. 486, it was held that an affidavit as to the consideration in a mortgage was not false because of the difference, representing a bonus, between the covenanted mortgage debt and the sum actually loaned, or because the debt was owing to the principal of an agent in whose name the mortgage was taken by proper authority. There was in that case a real liability on the part of the mortgagor to pay the stipulated debt to a mortgagee who was duly empowered to act in that capacity for the lender. In the present case the actual considerations for the mortgages were not loans to the mortgagors as indicated by their recitals, which the affidavits purported to verify, but to a borrower who was not a party to their execution, and the ostensible mortgagors were concededly exempt from any liability and devoid of knowledge as to the tenor and effect of the instruments." 158 Md. 641, 642, 149A, 459, 460.

The mortgages were therefore held invalid "as against specific [mechanics'] liens of labor and material claimants, who contributed to the improvement of the mortgaged land, * * * because the recited considerations, which the annexed affidavits purported to verify, were not true and *bona fide* as set forth in the mortgages". It was, however, also held: "Invalid mortgages must yield priority to the specific liens of attachments (*Ressmeyer v. Norwood; Cockey v. Milne, supra*), but it has been held that a judgment, being only a general lien, must be subordinated to the superior equity of a prior specific lien created by a defective mortgage or conveyance. *Dyson v. Simmons,* 48 Md. 207, 215; *Valentine v. Seiss,* 79 Md. 187, 28 A. 892; *Cramer v. Roderick,* 128 Md. 422, 98 A. 42. The same rule should apply, with at least equal force, when the competing judgment and

mortgage liens are considered in relation to property purchased, after the rendition of the judgment, with the proceeds of loans which the mortgages were given to secure and to which use of the money they expressly referred. In the cases last cited this court said that the judgment creditor stands in the place of his debtor and can only take the debtor's property subject to the equitable charges to which it was liable in his hands when the judgment was rendered. The equitable charge of the defective purchase and improvement money mortgages was impressed upon the mortgaged property when the title became vested in the judgment and mortgage debtor whose interests are involved in this suit, and in our opinion the mortgage liens must be preferred to judgments." 158 Md. 644, 645, 149 A. 459, 461. In *Groh v. Cohen* the purchaser did receive immediate conveyance of the equity and assume the mortgage debts and thereby become "the mortgage debtor"; thus the mortgages plus the assumption in the deed constituted an equitable mortgage from the purchaser to the mortgagees. In the instant case Norman never conveyed the equity to the partnership. There is, therefore, no writing creating an equitable mortgage from the partnership to Morris Kline—even if there were parol evidence of an agreement to that effect. This court has repeatedly recognized and enforced equitable mortgages and other equitable liens. It has been said that some of the earlier cases in certain states have engendered loose ideas as to "equitable liens." *Glenn on Mortgages,* § 17.4. However, to comply with the Statute of Frauds, some writing, however informal, is essential to create an equitable mortgage. *Tiffany, Real Property,* (3d. Ed.), § 1563; *Glenn, supra.* Since, therefore, there is no equitable mortgage in the instant case, Morris's claim under the mortgage must fail.

Moreover, in any event fraud does not create "equities" in favor of participants in the fraud. A conveyance to hinder, delay or defraud creditors is not an "equitable mortgage." Was the Kline mortgage such a conveyance?

Assuming that the deed alone was not a fraudulent conveyance, nevertheless the deed and the situation thereby created (*e.g.*, concealment of ownership) are circumstances to be considered in determining whether the mortgage was such a conveyance.

Aside from bankruptcy or insolvency statutes, preferences are not unlawful. They are not *per se* fraudulent, even when given to a wife or other near relative. *Drury v. State Capital Bank*, 163 Md. 84, 88-89, 161 A. 176. It has been uniformly so held under the statute of 43 Elizabeth, c. 5, and is in effect expressly so provided in the Uniform Fraudulent Conveyance Act, which is declaratory of the British statute. *Kennard v. Elkton Banking & Trust Co.*, 176 Md. 499, 500, 6 A. 2d 258. An antecedent debt is "fair consideration". Art. 39 B, sec. 3. If the law were otherwise, plaintiff in the instant case could set aside one preference to establish another. At the argument it was admitted that plaintiff did not proceed in bankruptcy because thereby the priority of its judgment would have been lost. By setting aside the mortgage as a fraudulent conveyance, plaintiff will obtain a lawful preference (in the absence of bankruptcy) by setting aside a fraudulent one.

Though a preference is not *per se* a fraudulent conveyance, a fraudulent conveyance is none the less a fraudulent conveyance because it is also a preference or is the means or end or an incident of a preference. *Dean v. Davis*, 242 U. S. 438, 37 S. Ct. 130, 61 L. Ed. 419; *Buffum v. Barceloux Co.*, 289 U. S. 227, 53 S. Ct. 539, 77 L. Ed. 1140; *Glenn on Fraudulent Conveyances and Preferences*, §§ 289, 289a. In *Ressmeyer v. Norwood*, (mentioned, *supra*, in *Groh v. Cohen*), a mortgage, in which the consideration stated and verified was not true and *bona fide* and the purpose and effect of which were to give and conceal a preference to certain creditors, was held void because its legal effect, purpose and intent was manifestly to delay, hinder and defraud creditors.

Though he who alleges fraud must prove it, facts and circumstances of a conveyance, especially one between

near relatives, may be such as to shift to one who claims to be a *bona fide* purchaser for value the burden of proving that he is. *Freedman v. Yoe,* 141 Md. 482, 487, 119 A. 260; *Commonwealth Bank v. Kearns,* 100 Md. 202, 209, 210, 59 A. 1010; *Kennard v. Elkton Bank and Trust Company,* 176 Md. 497, 500-501, 6 A. 2d 258. It is necessary to establish both a sufficient consideration and also *bona fides.* If a conveyance is made and accepted with intent to hinder, delay or defraud creditors, it matters not that a full consideration has been paid. *McCauley v. Shockey,* 105 Md. 641, 649-650, 66 A. 625.

The facts and circumstances of the instant case cast upon Morris Kline—and Samuel Yankelevitz—a burden of proof to explain "badges of fraud" and prove themselves *bona fide* mortgagees for value. *Drury v. State Capital Bank,* 163 Md. 84, 88-89, 161 A. 176. This burden has not been sustained. Through the deed to Norman and the fictitious verified statement of consideration in the mortgage, both the ownership of the property and the purpose and effect of the mortgage were concealed, and by the mortgage, on its face given for a fictitious debt, the partnership was stripped of its only remaining asset of value. An antecedent debt of the grantor or mortgagor is fair consideration, but not an antecedent debt of a third person. *Merchants Bank v. Page,* 147 Md. 607, 609, 128 A. 272. A conveyance of partnership property, when the partnership is insolvent, is fraudulent if made "without fair consideration to the partnership as distinguished from consideration to the individual partners." Art. 39B, sec. 8(b). Morris and Samuel have failed to show the first requisite, that their alleged antecedent debts were debts of the partnership not of Lewis. All the bank cashiers know is that certain money passed from Morris or from Samuel to Lewis. They do not know whether these monies were ever repaid or whether they represented debts of Lewis or of the partnership. They, and Morris, Samuel and Lewis, all testify that the money went to Lewis, who says it was used in his business. By the financial statement given to Dun

and Bradstreet the partnership represented that at December 31, 1947 it owed nothing to either Morris or Samuel. Neither of the partners has testified that this representation was not true. Nor has Morris or Samuel testified that it was not true or was not known to them. If it was false, the partners committed a gross fraud and perhaps a crime. We cannot, in order to support the burden of Morris and Samuel to show *bona fides* and a fair consideration, assume, without any testimony to that effect, that the partners were guilty of fraud or crime.

It is unnecessary to mention other facts and circumstances which we think tend to support our conclusion.

*Decree affirmed, with costs.*